CENTRAL ADVERTISING COMPANY v CITY OF ANN ARBOR

1. MUNICIPAL CORPORATIONS—ORDINANCES—AESTHETICS.

Aesthetics may be an incidental factor in the establishment of a municipal ordinance but cannot be the moving factor.

2. STATUTES—PUBLIC WELFARE—AESTHETICS.

The "public welfare", being a broad and inclusive concept, includes the aesthetic well-being of the citizenry.

3. STATUTES—AESTHETICS.

The decision as to what is aesthetically best for the community is for the Legislature to determine.

4. MUNICIPAL CORPORATIONS—ORDINANCES—SIGNS.

The prohibition by municipal ordinance of erecting commercial advertising signs within residential districts is not unreasonable.

5. MUNICIPAL CORPORATIONS—ORDINANCES.

An ordinance must be framed in terms sufficiently clear and definite so as to show what is required and prohibited thereby and to be understood with reasonable certainty.

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 391, 489.

[1–4, 6–8] Municipal power as to billboards and outdoor advertising. 58 ALR2d 1314.

[1–4] Aesthetic objectives or considerations as affecting validity of zoning ordinance. 21 ALR3d 1222.

[3, 4, 7] 58 Am Jur, Zoning § 74.

   3 Am Jur 2d, Advertising §§ 13, 14, 17.

[5, 6] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 367.

[6] 3 Am Jur 2d, Advertising § 14.

[8] 58 Am Jur, Zoning § 146 *et seq.*

   Validity of provisions for amortization of nonconforming uses. 22 ALR3d 1134.

[9, 10] 27 Am Jur 2d, Eminent Domain §§ 266, 277, 280, 281.

6. MUNICIPAL CORPORATIONS—ORDINANCES—VAGUENESS.

An ordinance that requires the removal of any sign that "constitutes a traffic hazard" by "obstructing the visibility of any traffic sign" is unenforceably vague.

7. MUNICIPAL CORPORATIONS—ORDINANCES—COMMERCIAL SIGNS.

A municipal corporation may regulate commercial advertising signs as an exercise of police power to eliminate traffic hazards and to improve the aesthetic surroundings of its citizens.

8. ZONING—AMORTIZATION—NONCONFORMING USE.

Amortization of nonconforming uses by destroying their status as nonconforming uses after a certain time is improper regardless of whether the nonconforming use is incidental or principal.

9. ZONING—NONCONFORMING USE—CONDEMNATION.

Nonconforming uses may be condemned, but just compensation must be paid, and "just compensation" is the same as fair market value (Const 1963, art 10, § 2).

10. ZONING—CONDEMNATION—COMPENSATION.

The ultimate determination as to what constitutes "just compensation" for purposes of condemning nonconforming uses, is a judicial function which may not be limited by the provisions of an ordinance to "fair market depreciated value".

Appeal from Washtenaw, Paul R. Mahinske, J. Submitted Division 2 May 4, 1972, at Lansing. (Docket Nos. 11311, 11312, 11313, 11973.) Decided July 24, 1972. Leave to appeal granted, 388 Mich 808.

Complaint by Central Advertising Company and other similarly situated parties against the City of Ann Arbor to challenge the validity of an ordinance to regulate advertising signs. Judgment for plaintiff. Defendant appeals. Reversed in part, affirmed in part.

*Fraser, Trebilcock, Davis & Foster* (by *James A. Park* and *Robert W. Stocker II*), for plaintiff Central Advertising Agency.

*Crippen, Dever & Urquhart,* for plaintiff Ann Arbor Implement Company.

*Burke, Ryan, Rennell & Foster,* for intervening plaintiffs Ann Arbor Bank, S. S. Kresge Company, Arbor Adler, Inc., and Harry Hawkins.

*Keyes, Creal & Hurbis,* for plaintiffs Shell Oil Company, Frank Agar, James Baker, Robert Stanczak, Robert Kirkham, and Super-Flite Oil Company.

*Jerold Lax,* City Attorney, and *R. Bruce Laidlaw,* Chief Assistant City Attorney, for defendant City of Ann Arbor.

Before: QUINN, P. J., and FITZGERALD and VAN VALKENBURG,* JJ.

FITZGERALD, J. These cases, heard simultaneously in the Washtenaw County Circuit Court, were instituted by the plaintiffs herein for the purpose of challenging the validity of an ordinance adopted by defendant City of Ann Arbor. That ordinance, adopted on December 12, 1966, was amended on March 4, 1968, and on May 20, 1968. Designated Chapter 61 of the Ann Arbor City Code, the ordinance provided a comprehensive scheme for the regulation of signs within the city.[1] A five-day trial commencing July 6, 1970, was had

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] The purpose of Chapter 61 is set forth in § 5:499 thereof as follows:

"[T]o permit such signs as will not, by reason of their size, location, construction, or manner of display, endanger life and limb, confuse or mislead traffic, obstruct vision necessary for traffic safety, or otherwise endanger the public morals, health or safety; and further, to regulate such permitted signs in such a way as to create land use patterns compatible with other major land use objectives and to prevent such signs from causing annoyance or disturbance to the citizens and residents of the City."

in the circuit court and, after testimony, the trial judge, by written opinion filed January 12, 1971, found the sign ordinance invalid. Judgments based on that opinion were filed in March, 1971. It is from those judgments that defendant city appeals.

The ordinance in question contains a multitude of interwoven provisions which add to the complexity thereof. Signs are distinguished in said ordinance according to function and structure. One functional type is the "off-premises advertising sign" which contains a message about a business not located where the sign is located. Off-premises signs of the ground-pole structural type are permitted in nonresidential districts, in accord with area, height, and placement requirements. With regard to signs of the "on-premises" functional type, that is, "business center", "business", and "identification" signs, certain structural types are permitted in certain zoning districts; in addition, square footage, height, placement, and number requirements are set out in the ordinance.

Certain signs are permitted in all districts. On the other hand, some signs are prohibited in all districts.[2] Permits are required for the erection

---

[2] Section 5:504 of the ordinance enumerates the prohibited signs as follows:

"(1) The following signs shall not be permitted, erected or maintained in any district, notwithstanding anything to the contrary contained in Section 5:502 or 5:503:

"(a) Signs which incorporate in any manner any flashing or moving lights.

"(b) Banners, pennants, spinners, and streamers except as specified in the Temporary Sign section.

"(c) String lights used in connection with commercial premises for commercial purposes, other than Christmas decorations.

"(d) Any sign which has any visible moving part, visible revolving parts or visible mechanical movement of any description or other apparent visible movement achieved by electrical, electronic or mechanical means, including intermittent electrical pulsations, or by action of normal wind currents.

"(e) Any sign or sign structure which (a) is structurally unsafe, or

and maintenance of signs, and there are provisions for periodic inspections, liability insurance and material composition.

With regard to nonconforming signs, the ordinance provides that: (1) signs in categories (a) through (d) and categories (j) through (m) of § 5:504 (see fn 2) were to be removed or brought into conformance within 75 days after the effective date of the ordinance, after which the nonconformance provisions of § 5:518 would not apply. (§ 5:518 grants the owner of a nonconforming sign the option of amortization or compensation); (2) signs in categories (e) through (i) of § 5:504 (fn 2), prohibited in all districts, were to be brought into conformance or removed immediately and the nonconformance provisions of § 5:518 would not apply; (3) signs projecting onto public ways were to be eliminated by July 1, 1968, unless the same were erected at a cost of $500 or more, in which case § 5:518 was applicable.

Pursuant to the nonconformance provisions of

(b) constitutes a hazard to safety or health by reason of inadequate maintenance, dilapidation or abandonment, or (c) is not kept in good repair, or (d) is capable of causing electrical shocks to persons likely to come in contact with it.

"(f) Any sign which, by reason, of its size, location, content, coloring or manner of illumination, constitutes a traffic hazard or a detriment to traffic safety by obstructing the vision of drivers, or by obstructing, or detracting from the visibility of any traffic sign or control device on public streets and roads.

"(g) Any sign which obstructs free ingress to or egress from a required door, window, fire escape or other required exit way.

"(h) Signs which make use of words such as "Stop", "Look", "Danger", or any other words, phrases, symbols or characters, in such a manner as to interfere with, mislead or confuse traffic.

"(i) Any sign or other advertising structure containing any obscene, indecent or immoral matter.

"(j) Any sign unlawfully installed, erected, or maintained.

"(k) Any sign now or hereafter existing which no longer advertises a bona fide business conducted, or a product sold.

"(l) Portable signs.

"(m) Commercial real estate signs in R1 and R2 Districts."

§ 5:518 of the sign ordinance, signs which cost under $500 may be maintained for three years from January 5, 1967, or for three years from date of installation or renovation. Signs which cost more than $500 may be maintained for longer periods including fifteen years for signs in which the investment is $10,000 or more. As an alternative to the foregoing amortization scheme, a hearing before the sign board of appeals may be held to determine the amount "which fairly compensates for the actual dollar cost of alteration of the sign or signs", in order to relocate the sign or bring the sign into conformity with the requirements of the ordinance. However, according to the ordinance, this amount may in no event exceed the "then fair market depreciated value of each said sign".

The ordinance sets out an appeal procedure under which variances can be obtained for "exceptional and peculiar" hardships. The record reflects the fact that the appeal procedures of the ordinance were not pursued by the plaintiffs herein.

Mr. Richard Lorencen, manager of the Ann Arbor office of plaintiff Central Advertising, testified that, at the time of trial, his company owned 58 billboards at 28 locations in Ann Arbor and approximately 178 in the Ann Arbor area. When the ordinance was adopted, 45 percent of the company's gross income was derived from its off-premises advertising, which income, Mr. Lorencen opined, would be totally lost if the company were subjected to the ordinance. Furthermore, $90,000 would be required to replace the billboards, and Mr. Lorencen expressed some doubt as to whether that figure could be reduced by salvaging certain of the parts for use at different sites, since the cost of disassembly would probably dissipate any salvage value.

Central Advertising has billboards which consist of at least 300 square feet of area, which is the size for which the billboard industry is apparently geared. Prior to trial, defendant city furnished Mr. Lorencen with a map showing 19 areas within the city in which billboards of this size could theoretically be located without violating the ordinance. However, it was asserted that few, if any, of those sites could be utilized because the ordinance itself eliminated many, particularly because other off-premises signs already exist on the parcels,[3] and possibly because of the set-back requirements.[4] Mr. Lorencen's view was that even if it were physically possible to meet the setback requirements, the signs would, because of their distance from the roadway, be rendered useless for advertising. On cross-examination, Mr. Lorencen indicated that plaintiff Central Advertising does own off-premises advertising signs of less than 300 feet and that no attempt was made to induce the owners of signs on the 19 sites to take them down.

Three expert witnesses, each possessing outstanding credentials, were presented; two by plaintiffs and one by defendant city. Mr. Carl McMonagle testified as to a study which he conducted for the United States Bureau of Public Roads and the Michigan State Highway Department. The conclusion which the study produced was that outdoor advertising signs have no effect on highway accidents. Mr. McMonagle further asserted that the only way in which the defendant's sign ordinance might enhance traffic safety is by eliminating signs which visually conflict with traffic signals; the nuances of the ordinance and the signs

---

[3] The ordinance provides that only one sign is to be placed upon any one unit of property within the city.

[4] Among others, one square foot for each square foot of the sign.

of plaintiffs which are rendered nonconforming thereby have little bearing on traffic safety. He testified that diminishing the visibility of signs might actually be detrimental to traffic safety.

Dr. Ernest Blanche, whose area of expertise was statistics, testified that he had analyzed Mr. Mc-Monagle's study and found it statistically reliable. Dr. Blanche also indicated that he had conducted a number of studies of his own with respect to highway features and traffic safety; his conclusion being the same as that reached by Mr. Mc-Monagle.

Defendant city produced as a witness Dr. Donald Cleveland, a traffic engineer employed at the University of Michigan, who stated that his profession was increasingly concerned with the problem of errant cars striking roadside obstacles. Dr. Cleveland made a laboratory investigation of this problem and determined that, as an obstacle is set back farther from the road, the likelihood that a vehicle will strike it is reduced; and that the rate of reduction increases as the obstacle is moved away from the road. Dr. Cleveland also explained that a driver's vision within a cone of certain dimensions should be unobstructed. The court was shown slides of 13 of 26 locations in Ann Arbor where signs purportedly conflict with traffic control devices within the cone. Each of the 26 locations was said to be in violation of the sign ordinance. Finally, Dr. Cleveland stated that the ideal traffic situation implies a complete elimination of signs.

Defendant city also called Mr. Raymond Martin, who was its planning director at the time the sign ordinance was passed. Mr. Martin set out some of the considerations which motivated the sign ordinance, among them being safety and aesthetics.

Defendant, City of Ann Arbor, claims first that the trial court committed error in concluding that the sign ordinance constitutes an unreasonable exercise of the municipal police power. Defendant argues that the ordinance contributes to the public health, safety and welfare by promoting traffic safety, preserving the local economy, enhancing recreational facilities, insuring compatible land use patterns, and affording a measure of beauty to the city. With regard to traffic safety, it is urged that the testimony of Dr. Cleveland was entitled to greater weight than that of Mr. McMonagle or Dr. Blanche, particularly since Dr. Cleveland identified specific locations in Ann Arbor where advertising signs and traffic control devices conflict. Neither Mr. McMonagle nor Dr. Blanche used Ann Arbor as the location of the studies upon which they relied. Further, in *1426 Woodward Avenue Corp v Wolff,* 312 Mich 352 (1945), and *Ver Hoven Woodward Chevrolet, Inc v Dunkirk,* 351 Mich 190 (1958), the Michigan Supreme Court indicated as a matter of law that, since signs can create traffic hazards, their regulation is within the scope of the police power.

Plaintiffs contend that the trial court quite properly concluded that the distinctions created by the sign ordinance have no real bearing on driving and pedestrian safety; that no evidence was presented which demonstrated that the signs of the respective plaintiffs are in any way hazardous to the city's inhabitants; and that the ordinance was motivated primarily by aesthetic considerations, rendering it invalid under Michigan law.

It cannot be doubted that, as the trial court found, aesthetic considerations were a factor—perhaps a major factor—in the adoption of the ordinance in question. The trial court, while holding

that aesthetics alone are not a valid basis upon which to enact an ordinance such as the present, did not state what part, if any, aesthetics *can* play in local government action. In that regard, the case of *1426 Woodward Avenue Corp v Wolff, supra,* is instructive. That case upheld a Detroit ordinance regulating projecting sidewalk signs and marquees even though "[i]t is conceded that the main, but not the sole, purpose of the ordinance·is to improve the appearance of Woodward Avenue" (p 364). In *Wolverine Sign Works v Bloomfield Hills,* 279 Mich 205 (1937), the Supreme Court, in striking down a complete prohibition of billboards, stated, however, that "[a]esthetics may be an incident but cannot be the moving factor" (p 208). The Court further stated at p 208:

"The city may establish zones and prohibit the erection of billboards therein and may, to promote public health, safety and general welfare, within reasonable considerations, regulate the maintenance of billboards but may not arbitrarily strike down the maintenance of erected billboards or vest·such power of arbitrary action in municipal officers.[5]

In the instant case, defendant city has sought to

---

[5] In the dissenting opinion in *Wolverine,* a 3-2 decision rendered in 1937, the following is contained at pp 209–210:

"We hold that where a regulation of billboards does not apply indiscriminately to the entire city, but merely to billboards in close proximity to parks and boulevards, it has a proper relation to the public health, comfort and welfare which it would not otherwise possess. So construed, the ordinances in question constitute a valid exercise of the police power.

\* \* \*

" 'If by the term "aesthetic considerations" is meant a regard \* \* \* for outward appearances, for good taste in the matter of the beauty of the neighborhood itself, we do not observe any substantial reasons for saying that such consideration is not a matter of general welfare. The beauty of a \* \* \* residence neighborhood is for the comfort and happiness of the residents, and it sustains \* \* \* the value of the property in the neighborhood.' "

protect the aesthetic well-being of its citizens. To provide such protection is to provide for the "public welfare", the same being a broad and inclusive concept. *Sun Oil Co v Madison Heights,* 41 Mich App 47 (1972). The decision as to what is aesthetically best for the community is for the Legislature to determine. *Berman v Parker,* 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954). However, in the case at hand, the record makes clear that the protection of the public safety, through the regulation of streets and highways, was a consideration which led to the adoption of the ordinance. In *Ver Hoven Woodward Chevrolet, Inc v Dunkirk, supra,* the Supreme Court recognized that public safety and welfare are involved in such regulation. The Court stated at pp 192–193:

"We need not expatiate upon the breadth of the power possessed by municipal authorities to control the erection and maintenance of signs, awnings, marquees, or other protuberances which, to some degree, obstruct light, air, and free vision along a public thoroughfare. The public safety and welfare are involved, not only as to motorists, confronted with a variety of flashing and static lights vying with traffic-control signals for the motorists' attention, but also with respect to pedestrians, to whom signs hanging over streets are always a possible menace, a potential hazard. See, generally, 7 McQuillan, Municipal Corporations (3d ed), § 24.587; *1426 Woodward Avenue Corp v Wolff,* 312 Mich 352."

See, also, *General Outdoor Advertising Co v Indianapolis, Dept of Public Parks,* 202 Ind 85; 172 NE 309 (1930).

Further, it has been held that the prohibition by ordinance of commercial uses within residential districts is not unreasonable. Thus, the regulation in § 5:504 of the ordinance in question, proscribing commercial real estate signs from residential dis-

tricts, is not invalid. *Superior Twp v Reimel Sign Co*, 362 Mich 481, 486 (1961); *Naegele Outdoor Advertising Co of Minnesota v Village of Minnetonka*, 281 Minn 492, 500; 162 NW2d 206, 212–213 (1968).

A review of the record convinces us that the prohibition of particular types of signs from all areas of the city was not predicated upon an exclusively aesthetic basis; that the considerations leading to the passage of the sign ordinance, including the safety of the citizenry, were within the police power; and that the ordinance constitutes a reasonable attempt, for purposes within the police power objectives, to harmonize the use of signs with the existing land uses in the city.

Defendant city contends further that the trial court erred in concluding that the ordinance constitutes a transparent attempt to eliminate billboards and other signs from the entire city. We agree with defendant city in regard to that contention. The comprehensive nature of the ordinance dictates against the court's conclusion. In any event, the necessity of ruling on the propriety of complete prohibition must properly await such an eventuality.

Defendant also asserts error in the finding of the court that the ordinance in question is too broad and too general in its terms. A study of the provisions thereof manifests that, for the most part, that finding by the court is erroneous. In 5 McQuillin, Municipal Corporations (3d ed), § 15.24, pp 95–97, it is stated in part:

"An ordinance must be clear, precise, definite and certain in its terms, and an ordinance vague to the extent that its precise meaning cannot be ascertained, is invalid, although otherwise it is constitutional and

valid. * * * Thus, an ordinance must be framed in terms sufficiently clear and definite to show what it intends to require or prohibit and punish and its language must be readily understandable by those upon whom it is to operate."

The ordinance in the instant case is, generally, framed in terms sufficiently clear and definite so as to show what is required and prohibited thereby. It is sufficiently definite to be understood with reasonable certainty. However, we hold that the following clause, found in § 5:504 of the ordinance, is vague and uncertain and, therefore, invalid:

"(f) Any sign which, by reason of its size, location, content, coloring or manner of illumination, constitutes a traffic hazard or a detriment to traffic safety by obstructing the vision of drivers, or by obstructing, or detracting from the visibility of any traffic sign or control device on public streets and roads."

The foregoing provision, being uncertain in its application and operation, and seemingly leaving execution thereunder to the caprice of those whose duty it is to enforce said ordinance, cannot stand. 5 McQuillin, Municipal Corporations (3d ed), § 15.24, p 97. See, also, §§ 18.12, 18.15. Pursuant to the severability clause of the ordinance,[6] the provision herein deemed to be invalid may be eliminated from the ordinance without affecting the remainder thereof.

The finding by the trial court that the ordinance in question constitutes a zoning ordinance does not

[6] "5:519. Severability. If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision and such holding shall not affect the validity of the remaining portions thereof."

appear to be clearly erroneous.[7] We rule, in accord with defendant city's position, however, that contrary to the court's finding, nothing in the record or in the court's opinion supports the conclusion that the statutory regulations governing the enactment of such ordinances were not complied with by defendant. No record support for that finding having been shown to exist, we deem the same to be without merit.

We have determined that the ordinance in question, in its basic objectives, constitutes a proper exercise of the municipal police power. We rule, therefore, that requests for variances predicated upon "practical difficulties or unnecessary hardships" created by attempted compliance with the ordinance should properly be addressed to the appeal procedure contained within the terms of the ordinance itself.

Defendant city asserts that the trial court erred in finding the ordinance in question to be confiscatory in its treatment of nonconforming signs. The city claims that *De Mull v City of Lowell,* 368 Mich 242 (1962), relied upon by the trial court, dealt with principal nonconforming uses rather than with incidental nonconforming uses such as the signs in the instant case, the latter being subject to amortization. Defendant further contends that, assuming *arguendo* that *De Mull* is applicable to all nonconforming uses, the ordinance permits the sign owner the option of com-

---

[7] 8 McQuillin, Municipal Corporations (3d ed), § 25.53, p 132, defines a zoning ordinance as follows:

"A zoning ordinance is one the nature and purpose of which is to regulate uses of lands and buildings according to districts, areas, or locations. * * *

"The question whether or not a particular ordinance is a zoning ordinance or measure may be determined by a consideration of the substance of its provisions and terms, and its relation to the general plan of zoning in the city."

pensation as an alternative to amortization, and that there was no evidence that any of the plaintiffs sought or received less than fair compensation.

Plaintiffs maintain that the trial court was correct in its determination that *De Mull* prohibits amortization of any existing nonconforming use, whether primary or incidental. They claim that defendant's formula for compensation containing a "fair market depreciated value" ceiling is not a recognized formula for arriving at "just compensation" and may in fact fail to provide any compensation at all in some instances because of the requirement that the depreciation factor be considered.

With regard to the alternative of amortization, we agree with plaintiffs and with the determination of the trial court that *De Mull* is controlling in its holding that amortization of nonconforming uses is improper. The Supreme Court stated in part at pp 250–252 of that opinion:

"Whatever the law may be in other States, law stemming as it does from specific and variant statutory zoning enactments and judicial construction thereof, the fact remains that the cities of Michigan have not as yet been authorized, by requisite legislative act, to terminate nonconforming uses by ordinance of time limitation. The question is governed by PA 1947, No 272, amending our municipal zoning statutes by adding new section 3a, reading as follows (CL 1948, § 125.583a [Stat Ann 1958 Rev § 5.2933(1)]):

" 'Sec. 3a. The lawful use of land or a structure exactly as such existed at the time of the enactment of the ordinance affecting them, may be continued, except as hereinafter provided, although such use or structure does not conform with the provisions of such ordinance. The legislative body may in its discretion provide by ordinance for the resumption, restoration, reconstruction, extension or substitution of nonconforming uses or

structures upon such terms and conditions as may be provided in the ordinance. In addition to the power granted in this section, cities and villages may acquire by purchase, condemnation or otherwise private property for the removal of nonconforming uses and structures: * * * The legislative body shall have authority to institute and prosecute proceedings for the condemnation of nonconforming uses and structures under the power of eminent domain in accordance with the laws of the State or provisions of any city or village charter relative to condemnation.'

"It will be noted that section 3a includes no authorization for elimination of a nonconforming use by an ordinance of time limitation. * * *

* * *

"So far the legislature has permitted ordinances providing only for resumption, restoration, reconstruction, extension, or substitution of nonconforming uses. It has withheld permission to destroy them, by time limitation or otherwise."

Defendant's contention that *De Mull* is limited in its application to principal uses is without merit. The language above quoted is unqualified; that is, a city cannot destroy by time limitation "nonconforming uses", whatever their nature. The amortization provision of the ordinance, is therefore without validity.

The compensation alternative, as it relates to nonconforming signs, contains in part the following in § 5:518:

"(5) If compensation by the City is elected by the sign owner, he shall file a claim for compensation with the Department of Building and Safety Engineering. * * * The Sign Board of Appeals is directed to take into account the cost of relocating, modifying, adjusting, rebuilding or otherwise altering each said sign in order to permit each said sign to be conforming under the terms of this Chapter. It is the intent of this section to permit a recommendation to be made to Council which

fairly compensates for the actual dollar cost of altera-
tion of the sign or signs to bring such signs into con-
formity with this Chapter *but in no event shall the
compensation recommended exceed the then fair mar-
ket depreciated value of each said sign.* * * *

"(6) * * * Nothing in this section shall prevent the
achievement of conformance with this Chapter by nego-
tiation and purchase, gift, exchange, voluntary compli-
ance, condemnation or other legal means including
action in any court of competent jurisdiction to carry
out the provisions of this Chapter * * * ." (Emphasis
supplied.)

MCLA 125.583a; MSA 5.2933(1), referred to in
the quotation from *De Mull, supra,* clearly permits
nonconforming uses to be condemned, but just
compensation must of course be paid. Const 1963,
art 10, § 2. "Just compensation" is the equivalent
of fair market value. *In re Widening of Bagley
Avenue,* 248 Mich 1 (1929).[8] It would appear that
the ceiling which the ordinance in question places
on compensation arbitrarily restricts investigation
into fair market value, or into the cost of altering,
rebuilding or relocating signs. It has been held
that nothing can be fairly termed "just compensa-
tion" which does not put the party damaged in as
good condition as he would have been had the
damage not occurred. The ultimate determination
as to what constitutes "just compensation" is a
purely judicial function. 5 Michigan Law & Prac-
tice, Condemnation, § 41, p 453.

We hold that, in addition to the invalidity of the
amortization provision of § 5:518 of the ordinance

---

[8] "Many technical rules have been promulgated for determining
value, none of which are important. The determination of value is not
a matter of formulas or artificial rules, but of sound judgment and
discretion based upon a consideration of all the relevant facts in a
particular case. * * *

"The compensation to be made is to be just. It is the fair cash
market value of the property to be taken. * * * " (pp 4–5.)

See, also, 5 Michigan Law & Practice, Condemnation, § 56, p 478.

in question, the compensation provision of the same section of said ordinance is likewise invalid to the extent that it is construed as placing a limit upon the judicial function of determining just compensation.

Our decision that the present provisions for the elimination of nonconforming signs are void does not prevent the City of Ann Arbor from adopting valid procedures for such elimination in conformity with MCLA 125.583a; MSA 5.2933(1).

Affirmed in part; reversed in part. No costs, this being a public question.

All concurred.