CENTRAL ADVERTISING COMPANY v CITY OF ANN ARBOR

OPINION OF THE COURT

1. MUNICIPAL CORPORATIONS—SIGN ORDINANCE—BILLBOARDS—HOME-
RULE ACT—CITY CHARTER—CITY COUNCIL.

A home-rule city council which through the interplay of diverse
restrictions in the city's sign ordinance effectively outlawed
billboards altogether in the guise of regulation exceeded its
authority under the home-rule act and the city's charter be-
cause neither the act nor the charter authorizes the council to
eliminate billboards (MCLA 117.4i[5]; Ann Arbor Charter,
§ 3.1[2][f]).

2. MUNICIPAL CORPORATIONS—HOME-RULE CITY—SIGN ORDINANCE—
CONSTITUTIONAL LAW—EVIDENCE—APPEAL AND ERROR—FACT-
FINDING—RECORD.

The Michigan Supreme Court should defer decision as to the
constitutionality of a home-rule city's sign ordinance as applied
to 177 sign plaintiffs where it is presented with a record
concerning a number of issues undifferentiated by fact-finding
and with briefs which make no reference to evidence which
would support and counter specific findings, because it should
not be without the guidance of adversary presentation directed
to the record and would run the risk of overlooking a fact
lurking in the record or, although not of record, known to, and
recognized by, counsel; the Court should require specific fact-
finding, plaintiff by plaintiff, and briefing focused on the eviden-
tiary support for such findings before it grapples with the
constitutionality of the sign restrictions in the ordinance.

DISSENTING OPINION

SWAINSON and M. S. COLEMAN, JJ.

3. MUNICIPAL CORPORATIONS—SIGN ORDINANCE—NONCONFORMING
SIGNS—AMORTIZATION—COMPENSATION—FAIR MARKET VALUE—
COURTS.

*Provisions of a city's sign ordinance granting the owner of a*

REFERENCE FOR POINTS IN HEADNOTES
[1–5] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
Political Subdivisions §§ 125–138.

nonconforming sign the option of amortization by maintaining the sign for designated periods of time based upon the cost of the sign or to have a hearing before the sign board of appeals to determine the amount "which fairly compensates for the actual dollar cost of alteration of the sign or signs", in order to relocate the sign or bring the sign into conformity with the requirements of the ordinance which amount may in no event exceed the "then fair market depreciated value of each said sign", is invalid as to amortization of nonconforming uses because a city cannot destroy nonconforming uses by time limitation and the compensation provision is likewise invalid to the extent it is construed a limit upon the judicial function of determining just compensation, which is the equivalent of fair market value (Ann Arbor City Code § 5.518).

4. MUNICIPAL CORPORATIONS—CITY CHARTER—LICENSES—BILLBOARDS —SIGNS—POLICE POWER—HEALTH—SAFETY—MORALS—GEN- ERAL WELFARE.

Provisions of a city charter for licensing, regulating and limiting the number and location of billboards and advertising signs must be construed in relation to that integral attribute of sovereignty known as police power; such power has been dele- gated to cities by the home-rule act and exercise of this power must bear a reasonable relationship to the health, safety, morals or general welfare of the community (MCLA 117.3[j]; Ann Arbor Charter, ch 3).

5. MUNICIPAL CORPORATIONS—SIGN ORDINANCE—POLICE POWER— HEALTH—SAFETY—MORALS—GENERAL WELFARE.

Sign ordinance of a city is invalid ab initio where by its terms and in its application, the ordinance comprises an unreasonable exercise of police power, it results in arbitrary and capricious prohibitions where, as a matter of fact and law, plaintiffs established by a clear preponderance of factual and legal proofs by both expert and lay witnesses testimony that the ordinance bears no real and substantial relationship to the public health, safety, morals or general welfare of the citizens of the city (Ann Arbor City Code § 5.499 et seq.).

Appeal from Court of Appeals, Division 2, Quinn, P. J., and J. W. Fitzgerald and Van Valken- burg, JJ., reversing in part and affirming in part Washtenaw, Paul R. Mahinske, J. Submitted Sep- tember 6, 1973. (No. 9 September Term 1973,

Docket Nos. 54,310–54,313, 54,316.) Decided May 21, 1974. Rehearing denied June 25, 1974.

42 Mich App 59 reversed.

Complaints by Central Advertising Company and others to challenge the validity of an ordinance to regulate advertising signs. Ann Arbor Bank and others intervened as parties plaintiff. Judgment for plaintiffs. Defendant appealed to the Court of Appeals. Reversed in part, affirmed in part. Plaintiffs and defendant appeal. Cases consolidated. Remanded to trial court for specific fact-finding.

*Fraser, Trebilcock, Davis & Foster* (by *James A. Park* and *Robert W. Stocker II),* for plaintiff Central Advertising Agency.

*Crippen, Dever, Urquhart & Cmejrek,* for plaintiff Ann Arbor Implement Company.

*Burke, Ryan, Rennell, Foster & Hood,* for intervening plaintiffs Ann Arbor Bank and others.

*Keyes, Creal & Hurbis,* for plaintiff Shell Oil Company and others.

*Jerold Lax,* City Attorney, and *R. Bruce Laidlaw,* Chief Assistant City Attorney, for defendant City of Ann Arbor.

Amicus Curiae: *Bodman, Longley, Bogle, Armstrong & Dahling* (by *Theodore Souris* and *Harold M. Deason),* for Eller Outdoor Advertising Company of Michigan.

LEVIN, J.

I

The trial judge found, and the record supports this finding, that the interplay of diverse restrictions in the Ann Arbor Sign Ordinance effectively outlaws billboards. In the guise of regulation, the City Council of Ann Arbor has proscribed billboards altogether.

The home-rule act authorizes a charter provision "[f]or licensing, regulating, restricting and limiting the number and locations of billboards within the city". MCLA 117.4i(5); MSA 5.2082(5).

The charter of the city authorizes "[l]icensing, regulating, and limiting the number and location of billboards and advertising signs".[1]

Neither the home-rule act nor the charter of the city authorizes the council to eliminate billboards. In combination, the various restrictions, tantamount to a proscription of billboards, exceed the authority of the council under the home-rule act and charter.

II

The ordinance does not ban all signs—as distinguished from billboards—either in terms or in practical effect.

The 177 sign plaintiffs who joined in the complaints filed in these consolidated proceedings are affected differently by the multifarious sign limitations in the ordinance.

The trial judge's opinion does not contain particularized findings of fact. His findings were conclusory: "the Sign Ordinance is a transparent attempt to exclude billboards, and other forms of signs, from the entire City, in time, and not to exclude

---

[1] Ann Arbor Charter, § 3.1(2)(f).

such merely from residential areas". While the
record clearly supports this conclusion as to bill-
boards, it is manifest that the ordinance, although
it places innumerable restrictions on signs, does
not ban them altogether.

The plaintiffs do not contend that all signs are
proscribed presently or in time. They claim,
rather, that certain provisions of the sign ordi-
nance are unreasonable or unreasonable as ap-
plied to them. They rely on the "finding" just
quoted and the following also conclusory "finding":

"[I]t is the opinion of this court, and the court finds as
a matter of fact and law that the City of Ann Arbor
Sign Ordinance (so called) is and was an unreasonable
police power regulation of said City, is too general, too
broad in its attempted application, confiscatory (under
the *De Mull*[2] case), zoning legislation in nature which
did not comply in its enactment to statutory regulation
and an unconstitutional violation of freedom of speech,
press and religion."

The opinion of the trial court sweeps as broadly
as the ordinance so roundly condemned. We are
left to speculate what specific provisions of the
sign ordinance—what sign restrictions—are "too
general, too broad".

Our colleagues' opinion cites various examples of
"unreasonable" provisions of the ordinance. These

---

[2] *De Mull v City of Lowell,* 368 Mich 242, 250; 118 NW2d 232
(1962).

This Court stated, "Whatever the law may be in other States, law
stemming as it does from specific and variant statutory zoning enact-
ments and judicial construction thereof, the fact remains that the
cities of Michigan have not as yet been authorized, by requisite
legislative act, to terminate nonconforming uses by ordinance of time
limitation".

The Court of Appeals rejected the city's efforts to distinguish *De
Mull* stating, *"De Mull* is controlling in its holding that amortization
of nonconforming uses is improper". *Central Advertising Co v Ann
Arbor,* 42 Mich App 59, 73; 201 NW2d 365 (1972).

examples are not derived from findings of the trial judge—there are, to repeat, no specific findings. A few of the examples are mentioned in the brief of the billboard plaintiff, Central Advertising Company. Most of the examples are derived from the record without the benefit of adversary briefing in this Court.[3]

The joint brief of the sign plaintiffs makes three arguments, one of which is adopted by our colleagues:[4] "The Ann Arbor Sign Ordinance constitutes an unconstitutional exercise of the police power". In support, counsel argues that the ordinance is an "attempted wholesale proscription of *certain types* of signs". (Emphasis supplied.) No example is given other than a fleeting reference focusing on the amortization issue (see fn 2): "In the instant case, of course, for moving signs, such as Ann Arbor Bank's signs, there is only a 75 day amortization period and no compensation provision whatsoever is provided".

While some provisions of the sign ordinance may be unreasonable—*e.g.,* outlawing moving signs, the one example cited in the brief of counsel—it is doubtful whether each and every sign restriction in the Ann Arbor Sign Ordinance can properly be said to be unreasonable or unreasonable as applied to 177 separate plaintiffs.[5]

---

[3] The brief filed in behalf of the sign plaintiffs accepts the facts as stated by Central Advertising Company. Central Advertising's statement of facts focuses primarily on its principal concern—the billboard provisions of the ordinance.

[4] The other two arguments are that Michigan law does not authorize amortization of nonconforming uses (see fn 2); and that the sign ordinance is in reality a zoning ordinance which was not enacted in a manner conforming to the requirements of the city and village zoning-enabling act. MCLA 125.584; MSA 5.2934. The reenactment of the ordinance as Chapter 61A in a manner conforming to those requirements appears to have mooted this latter issue in this action for a declaratory judgment.

[5] Among the types of signs prohibited by § 5:504 of the sign ordinance are:

It is not apparent which of the 177 plaintiffs are adversely affected by the "unreasonable" provisions of the sign ordinance adverted to in our colleagues' opinion or how many might be similarly situated. Yet all 177 plaintiffs are to be granted relief, and not just the "offending" provisions of the ordinance but the entire ordinance is declared unreasonable and unconstitutional.

An appellate court may, indeed, properly make an independent search of the record. However, when an appellate court does so without the guidance of adversary presentation directed to the record it runs the risk of overlooking a fact lurking in the record or, although not of record, known to, and recognized by, counsel. If the ordinance were not so complex and if there were not so many plaintiffs with seemingly different complaints, we might join our colleagues in an independent search of the record.

We have concluded, however, on the same principles that preclude us from attempting to decide this intricate litigation on the allegations of the complaint and the traverse in the answer, which preclude us from deciding an abstract, generalized

---

"(e) Any sign or sign structure which (a) is structurally unsafe, or (b) constitutes a hazard to safety or health by reason of inadequate maintenance, dilapidation or abandonment, or (c) is not kept in good repair, or (d) is capable of causing electrical shocks to persons likely to come in contact with it.

"(f) Any sign which, by reason of its size, location, content, coloring or manner of illumination, constitutes a traffic hazard or a detriment to traffic safety by obstructing the vision of drivers, or by obstructing, or detracting from the visibility of any traffic sign or control device on public streets and roads.

"(g) Any sign which obstructs free ingress to or egress from a required door, window, fire escape or other required exit way.

"(h) Signs which make use of words such as 'Stop', 'Look', 'Danger', or any other words, phrases, symbols or characters, in such a manner as to interfere with, mislead or confuse traffic. * * *

"(k) Any sign now or hereafter existing which no longer advertises a bona fide business conducted, or a product sold."

controversy without supporting evidence, that we should defer decision in this case. We are presented with a record concerning a number of issues undifferentiated by fact-finding and with briefs which make no reference to evidence which would support and counter specific findings.

Before grappling with the constitutionality of the sign restrictions in this ordinance,[6] we should require specific fact-finding, plaintiff by plaintiff, and briefing focused on the evidentiary support for such findings.

We remand for specific fact-finding and direct report to us on the record already made, supplemented as the parties desire, and further briefing after such fact-finding. On receipt of that report and further briefs we can then appraise the reasonableness of the provisions of the sign ordinance in the context of the facts as they affect the individual sign plaintiffs.

T. M. Kavanagh, C. J., and T. G. Kavanagh and Williams, JJ., concurred with Levin, J.

M. S. Coleman, J. *(dissenting)*.

## *HISTORY OF CASES*

City Council of defendant Ann Arbor adopted Chapter 61 of the Ann Arbor City Code (hereinafter designated the "sign ordinance") on December 12, 1966, effective ten days after its adoption. It

---

[6] The sign plaintiffs, except for intervenor John Lee Oldsmobile, Inc., do not appear to have availed themselves of an administrative remedy set forth in the ordinance by applying to the Sign Board of Appeals for a variance. John Lee Oldsmobile sought and was granted a variance and then withdrew from the action subsequent to the judgment of the trial court.

Relief obtained through the administrative process might render constitutional adjudication unnecessary or premature.

was amended on March 4, 1968 and on May 20, 1968. Several challenges to the validity of the ordinance were subsequently commenced. After numerous legal maneuverings, the subject cases were tried simultaneously in the circuit court of Washtenaw County from July 6, 1970 through July 10, 1970. An opinion was filed on January 12, 1971 and judgments were filed on March 2, 1971, invalidating the sign ordinance *ab initio*. The opinion of the Court of Appeals was filed on July 24, 1972 upholding in part[1] and reversing in part[2] the judgments of the circuit court. Plaintiffs and defendant are both appellants and appellees, appealing those portions of the findings of the Court of Appeals which operated against their respective positions.

This Court granted leave to appeal and to consolidate the subject cases on November 28, 1972, and granted an extension of time to file briefs and appendices. Oral arguments were held in September, 1973.

## ISSUES

This Court affirms the decision of the Court of Appeals that the amortization and compensation provisions (§ 5:518) of the sign ordinance are invalid and adopts the reasoning of that Court as set forth in 42 Mich App 59, 72–76; 201 NW2d 365 (1972).

The remainder of the ordinance presents a central question. Does the Ann Arbor sign ordinance constitute an invalid exercise of police power?

---

[1] The Court of Appeals found that § 5:504(f) *infra* was invalid as being "vague and uncertain" and that § 5:518 was invalid as to its amortization and compensation provisions.

[2] The remainder of the ordinance (from which the offending sections were to be severed) was found to be valid.

A. Does the sign ordinance operate as a general prohibition of legitimate outdoor advertising within the City of Ann Arbor without reasonable relationship to public health, safety, morals, peace or welfare of the community?

B. Is the sign ordinance so broad and general that it is rendered arbitrary, capricious and unreasonable in its application?

The following opinion is confined to the facts of the instant cases and in no way purports to invalidate proper regulations within the legitimate police powers of a municipality.

## THE ORDINANCE

The ordinance announces in § 5:501 that "[a] sign not expressly permitted is prohibited."

A reading of the entire ordinance further projects a general prohibition with certain exceptions (§§ 5:502–5:503) and then proceeds to extract numerous exceptions (§ 5:504) from the exceptions.

The ordinance begins in § 5:499, with its stated purpose, which is:

"[T]o permit such signs as will not, by reason of their size, location, construction, or manner of display, endanger life and limb, confuse or mislead traffic, obstruct vision necessary for traffic safety, or otherwise endanger the public morals, health, or safety; and further, to regulate such permitted signs in such a way as to create land use patterns compatible with other major land use objectives and to prevent such signs from causing annoyance or disturbance to the citizens and residents of the City."

A "sign" is given the following definition:

"A name, identification, description, display or illustration which is affixed to, or painted, or represented

directly or indirectly upon a building, structure or piece of land, and which directs attention to an object, product, place, activity, person, institution, organization or business and which is visible from any public street, right-of-way, sidewalk, alley, park or other public property."

This description is divided into 13 more specific areas.

Signs permitted are classified (§ 5:502) as to whether they are on-premises advertising, off-premises advertising or of such a nature as to be generally permitted. Unilluminated temporary signs (requiring permits) are dealt with in § 5:503.

The exceptions to the exceptions to the general prohibition are set forth in § 5:504. They are not permitted even if they meet the requirements of §§ 5:502–5:503. The list is as follows:

"(a) Signs which incorporate in any manner any flashing or moving lights.

"(b) Banners, pennants, spinners, and streamers except as specified in the Temporary Sign section.

"(c) String Lights used in connection with commercial premises for commercial purposes, other than Christmas decorations.

"(d) Any sign which has any visible moving part, visible revolving parts or visible mechanical movement of any description or other apparent visible movement achieved by electrical, electronic or mechanical means, including intermittent electrical pulsations, or by action of normal wind currents.

"(e) Any sign or sign structure which (a) is structurally unsafe, or (b) constitutes a hazard to safety or health by reason of inadequate maintenance, dilapidation or abandonment, or (c) is not kept in good repair, or (d) is capable of causing electrical shocks to persons likely to come in contact with it.

"(f) Any sign which, by reason of its size, location, content, coloring or manner of illumination, constitutes a traffic hazard or a detriment to traffic safety by

obstructing the vision of drivers, or by obstructing, or detracting from the visibility of any traffic sign or control device on public streets and roads.

"(g) Any sign which obstructs free ingress to or egress from a required door, window, fire escape or other required exit way.

"(h) Signs which make use of words such as 'Stop' 'Look', 'Danger', or any other words, phrases, symbols or characters, in such a manner as to interfere with, mislead or confuse traffic.

"(i) Any sign or other advertising structure containing any obscene, indecent or immoral matter.

"(j) Any sign unlawfully installed, erected or maintained.

"(k) Any sign now or hereafter existing which no longer advertises a bona fide business conducted, or a product sold.

"(l) Portable signs.

"(m) Commercial real estate signs in R1 and R2 Districts."

Nonconformance with this section is not permitted.

Certain technical and procedural provisions follow, including the establishment of a permit system. The director of building and safety engineering is authorized to adopt rules and regulations "to interpret and implement provisions of this Chapter and to secure the intent thereof." These are considered to be of the same effect as if originally included in the ordinance.

The ordinance creates a sign board of appeals, giving it authority to authorize variances

"from the strict application of this Chapter where such application will result in practical difficulties or unnecessary hardships to the person owning or having the beneficial use of the property or sign for which a variance is sought; except that no variance may be granted from the strict application of Section 5:515."

Such hardships must be "exceptional and peculiar to the property", must "include substantially more than mere inconvenience" or "inability to attain a higher financial return".

Included is a severability provision. Criminal penalties (up to $100 and/or 90 days) for violations are provided and it is stated that the ordinance will control if its terms conflict with any other law or ordinance.

## THE TRIAL

The trial judge, in his own words, came to his conclusions after "hearing the testimony of some fifteen witnesses, arguments of counsel for all parties and viewing dozens of exhibits and after the court made no less than six automobile trips around and through the City of Ann Arbor, in addition to making on-foot-examinations of the downtown area and three shopping areas involved, and after having examined and reexamined briefs of all parties concerned." There were eight attorneys participating in this five day trial.

*Central Advertising Company* (hereinafter called Central).

Central produced evidence to the effect that it conducts business principally in two categories:

1. "Off-premises" billboards which are owned by Central and usually on property leased from the land owner.

2. "On-premises" outdoor signs and displays usually advertising products and services available from and on the location of the owner. (It also services "on-premises" signs.)

Central started business in Ann Arbor in 1963. As of December 31, 1966, Central owned 60 billboards at 28 locations within the City of Ann

Arbor, 58 of which existed at time of trial. All but
2 are of 300 square feet, a size which has been
adopted in the more than 1,000 member industry
so that standardized posters can be used. The
other 2 are a standard 750 square feet. All have
been declared nonconforming as a result of the
sign ordinance. Central complains that it stands to
lose its entire Ann Arbor market investment val-
ued in excess of $300,000. Central also will lose
substantial fees derived from servicing signs
owned by others, including the other plaintiffs.

None of the 19 sites approved for billboards
through the ordinance were found to be useable
under the terms of the ordinance itself, excepting
one site for a single board located behind the
Michigan Bell warehouse by its truck parking lot.
Central's off-premises billboard business has been
abolished, not regulated.

*Other Plaintiffs*

The remainder of the plaintiffs charge that the
ordinance additionally outlaws the use of all
preexisting and harmless nonconforming signs.
They claim this is a blanket prohibition bearing no
relation to the public health, safety, morals or
general welfare. No testimony was produced at
trial to the effect that any of these types of signs
were unsafe or constituted a traffic hazard, al-
though there was testimony that the signs were
not dangerous or hazardous.

The testimony included many interesting viola-
tions. No moving barber pole or bank clock-tem-
perature sign or gasoline sign is permitted. A
lighted moving sign may be placed inside a store
window. In like manner, any sign forbidden on the
outside of a store may be placed inside.

Individual citations for violations of the ordi-
nance run the gamut. The owner of a small gro-

cery store testified that he received a violation for displaying an "A-frame" type sign outside the store when open and, upon taking it in, he lost considerable money. A gasoline station owner testified that he received a violation for displaying a 3' high portable sign advertising oil, for a revolving sign advertising the gasoline brand, for a soft drink machine outside the station, for merchandise racks, for banners hung over the pumps, for an ice machine, for decals on the outside of doors, for a push-pull sign on the door and for discarded signs lying flat on the ground. A church was cited because its name was too large on a brick wall.

Deluxe Drapery and Shade Company owned what had comprised two stores with connecting doors and two window fronts. The name of the store extended across the tops of the two glass fronts. This constituted a violation because lettering could be over only one window front. The shop, therefore, pasted paper over half of the area containing the words "and Shade Company". Had the store fronts been owned by two businesses, the entire area could have been used, one for each owner.

A real estate broker testified that "after a flood of violations" resulting from placing "For Sale" signs in front of houses in residential areas, he shifted his business out of Ann Arbor. Property had become too difficult to sell.

An independent gas station attendant testified that his main business came through posting the price on a pedestal about 15 feet high. According to the ordinance, the only place he could put the sign was in back of the building.

Various franchised businesses identifiable by well-known and easily recognized signs were forbidden to use such signs. One witness said that a

corner gas station was permitted two pole signs while the adjacent Burger Chef drive-in was permitted none because it was located in the shopping center. Its competitor across the street, however, could have a pole sign.

The plaintiffs then examined an individual who has responsibility for enforcing the ordinance. This witness indicated that it is a violation of the ordinance to have a small credit card sign attached to the pole supporting another sign. Any revolving sign anywhere in the city, or any sign with revolving parts was said to violate the ordinance. A stationary sign indicating that a building was the YM-YWCA violated the ordinance because it was not properly set back from the property line.

Particularly damaging was the testimony elicited from the assistant city administrator responsible for planning and community development. Although the examination must be read in full to appreciate fully its impact, the witness did indicate the all inclusive and extremely unreasonable nature of the ordinance.

One example has to do with the on-premises sign of the Pretzel Bell:

"*Q.* Would you agree with me, from your knowledge of zoning, that the Pretzel Bell downtown would be located in the C2A section?

"*A.* Yes, I think it is.

"*Q.* Would you also agree with me from looking at page three of the ordinance that, that is the sign ordinance that while a merchant can have a projecting sign in C2A downtown business section, he is regulated with the kind of copy or material he can put on that, is that not correct?

"*A.* As distinguished between business and identification in that category, yes.

"*Q.* For example, if he put his name, Pretzel Bell, and

stopped there, that would be an identification, if that is his name, is that correct?

"*A.* That's correct.

"*Q.* On that sign, does there appear to be some more copy other than the words Pretzel Bell?

"*A.* Yes.

"*Q.* What other copy appears there?

"*A.* Food for the Gourmet.

"*Q.* That would be a business category?

"*A.* Yes, I would suggest so.

"*Q.* And as such, the addition of those words would render that sign illegal under the ordinance?

"*A.* Yes.

"*Q.* Is that correct, whereas if it met the specifications of size and just had the words Pretzel Bell, it would be legal?

"*A.* I would think so, yes."

Other testimony revealed that because the set of letters installed on the football stadium at the University of Michigan extend three feet above the top of the stadium, it is nonconforming.

One woman evaded the penalties of the ordinance by ordering a pole sign moved. Her business sits back "quite a ways" and no one could see the sign, so she ordered it attached to the top of her automobile which she then parked by the road entrance. Although illegal if stationary, it was legal on the automobile.

Numerous other examples of the ordinance application appear in the testimony, but those above are illustrative of the prohibitive, arbitrary, capricious and unreasonable nature of the ordinance.

With such a background, the finding of facts by the trial judge must be given considerable weight[3] as must his conclusion "that the Sign Ordinance is

[3] GCR 1963, 517.1 says that in actions tried without a jury, the judge's finding of facts "shall not be set aside unless clearly erroneous."

a transparent attempt to exclude billboards, and other forms of signs, from the entire City, in time, and not to exclude such merely from residential areas". We agree.

## THE LAW

Art 7, § 22 of the 1963 Const provides as follows:

"Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section."

Art 7, § 34 mandates that the provisions of the constitution and laws concerning cities "shall be liberally construed in their favor".

The home-rule act is found in MCLA 117.1 *et seq.;* MSA 5.2071 *et seq.* It states in § 4-i(5) that "each city may in its charter provide for licensing, regulating, restricting and limiting the number and locations of billboards within the city." Ch 3 of the Ann Arbor charter concerns general municipal powers and permits the city to "provide for the public welfare by * * * [l]icensing, regulating, and limiting the number and location of billboards and advertising signs".

The provisions above must be construed in relation to that integral attribute of sovereignty known as police power. Such power has been delegated to cities by the home-rule act. See

MCLA 117.3(j); MSA 5.2073(j). Exercise of this power must bear a reasonable relationship to the health, safety, morals or general welfare of the community.

As stated in *Carolene Products Co v Thomson,* 276 Mich 172; 267 NW 608 (1936)

"But the police power of regulation does not include the absolute prohibition of trade in useful and harmless articles of commerce. Being prohibitory, the act must be declared invalid.

"The principles involved are well settled and do not need extensive citation of authorities. The constitution guarantees to citizens the general right to engage in business which does not harm the public. *People, ex rel. Valentine v Berrien Circuit Judge,* 124 Mich. 664 (50 L.R.A. 493; 83 Am. St. Rep. 352) [83 NW 594 (1900)]. The constitutional right to engage in business is subject to the sovereign police power of the State to preserve public health, safety, morals or general welfare and prevent fraud. In the exercise of the police power there must be *not only a public welfare to be conserved or public wrong to be corrected, but there must be also a reasonable relation between the remedy adopted and the public purpose.* (Emphasis supplied.)" (p 178.)[4]

This state has long recognized that there must be a reasonable relationship between the remedy adopted and the public purpose.

In *People v Snowberger,* 113 Mich 86; 71 NW 497; 67 Am St Rep 449 (1897), the Court said:

"Generally, it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety. If it passes an act ostensibly for the public health, and

---

[4] *Also see Grocers Dairy Co v Department of Agriculture Director,* 377 Mich 71; 138 NW2d 767 (1966) in which *Carolene* was cited in support of its conclusion that:

"[T]he issue is not the wisdom or judgment displayed by the legislature, but, rather, the reasonableness of the statutory regulation."

thereby destroys or takes away the property of the citizen or interferes with his liberty, it is for the courts to determine whether it relates to and is appropriate to promote such public health." (p 91.)

In *Roman Catholic Archbishop of Detroit v Village of Orchard Lake,* 333 Mich 389; 53 NW2d 308 (1952), the Court said at p 392 that:

"The test of legitimacy [of the exercise of the police power] is the existence of a real and substantial relationship between the exercise of those powers in a particular manner in a given case and public health, safety, morals, or the general welfare."

It is also long established that a citizen may pursue a lawful business without unreasonable interference by the government.

*Harrigan & Reid Co v Burton,* 224 Mich 564; 195 NW 60 (1923) dealt with an ordinance which regulated installation of heating units in dwellings. Acknowledging that such ordinances are generally presumed valid, the Court distinguished:

"[M]unicipal ordinances, though ostensibly enacted as public regulations, which are so framed as to control or regulate a common and useful private business or occupation in life are subject to review and investigation in the courts to determine their validity by the test of whether, under the guise of a police regulation, there is an arbitrary, unreasonable or unwarranted interference with the constitutional rights of the private citizen to pursue a lawful business or calling, and to make contracts with others in relation thereto."

In *Levy v Pontiac,* 331 Mich 100; 49 NW2d 80 (1951), the city had sought to restrict signs advertising gasoline prices to those not larger than one square foot which were to be attached to pumps. The issue was "whether the controversial portion of the ordinance bears a reasonable relation to the

public peace, health, morals, welfare and safety"
(p 103). Acknowledging the power of the city to
ban false or misleading advertising, the Court said
the

"right to advertise one's merchandise is, subject to the
police power mentioned, within the right to liberty and
property. The denial of such right is a taking of prop-
erty without due process of law. *Ritholz v City of
Detroit,* 308 Mich 258 [13 NW2d 283 (1944)].
    "Business practices, such as the one against which
the ordinance in question is directed, have no detrimen-
tal effect on public health, peace, morals, safety and
welfare. The size of signs which plaintiff may care to
use, and their location at points other than the pumps,
if such signs are not misleading or fraudulent, may not
be regulated by the legislative body of defendant city."
(p 103.)

The effect of the instant sign ordinance is not
only to render illegal all of the billboards owned
by plaintiff Central, but effectually to ban outdoor
advertising in Ann Arbor.

There has been no persuasive argument that
any of the subject signs or billboards constituted a
nuisance per se or that any constituted a threat to
safety, health, morals, peace or public welfare.

The ordinance is not limited to any specific area,
but is broad and general in nature. In no similar
case previously decided by this Court has the
governing body acted in such an all-inclusive,
prohibitory fashion. Unlike those cases, the ordi-
nance before us is not limited in application to a
certain sector of the city or to a particular type of
sign.[5]

Although we have expressed disagreement with

---

[5] *Compare Wolverine Sign Works v Bloomfield Hills,* 279 Mich 205;
271 NW 823 (1937); *1426 Woodward Avenue Corp v Wolff,* 312 Mich
352; 20 NW2d 217 (1945); and *Ver Hoven Woodward Chevrolet Inc v
Dunkirk,* 351 Mich 190; 88 NW2d 408 (1958).

specific provisions of the ordinance, our greater concern is with the ordinance as a whole. By its terms and in its application, the ordinance comprises an unreasonable exercise of police power. It results in arbitrary and capricious prohibitions. We agree with the trial judge that

"as a matter of fact and law, that the plaintiffs herein have established by a clear preponderence of factual and legal proofs by both expert and lay witnesses testimony that the Ordinance in question bears no real and substantial relationship to the public health, safety, morals or general welfare of the citizens of the City of Ann Arbor."

For these reasons and for the reasons set forth in the opinion of the Court of Appeals relating to amortization and compensation, we find the ordinance invalid *ab initio.*

The Court of Appeals is affirmed in part and reversed in part.

SWAINSON, J., concurred with M. S. COLEMAN, J.

J. W. FITZGERALD, J., did not sit in this case.