**In the Matter of Bus WHITE, Debtor.**

**Bus WHITE, Debtor-Plaintiff,**

v.

**The CHARTER TOWNSHIP OF BRIDGEPORT, a Michigan Municipal Corporation, Defendant.**

**Bankruptcy No. 76–30192 C–3.**

United States Bankruptcy Court,
E. D. Michigan, S. D.

Feb. 13, 1980.

Arthur L. Petersen, Saginaw, Mich., for plaintiff.

Haines & Marti, George W. Marti, Bridgeport, Mich., and Braun, Kendrick, Finkbeiner, Schafer & Murphy, Kenneth W. Kable and Edward J. McArdle, Saginaw, Mich., for defendant.

## OPINION

HAROLD H. BOBIER, Bankruptcy Judge.

In this action, the plaintiff Bus White is seeking to deposit spent foundry sand on

property which he owns located in the defendant Charter Township of Bridgeport. The defendant claims that such deposit is governed by its zoning ordinance, and is prohibited. The plaintiff denies the existence of any governing local rules or regulations.

### Findings of Fact

Bus White is the owner of a parcel of land of approximately eighty acres located in Bridgeport. White acquired land in 1972, and it has been farmed for the last twenty years, with some interruption, according to the record made in this matter. Prior to the acquisition of the land in question by the plaintiff, the defendant Township enacted a zoning ordinance, effective November 12, 1971, which classified this land as part of an "R–1A" zone. See Defendant's Exhibit N, of May 3, 1979, the Bridgeport Charter Township Compiled Ordinance Zoning Code.

Under the defendant's zoning ordinance, the land uses permitted in the R–1A district are, among others, single family residences and farms. See Ordinance No. VII, B–1, § 20.071(b), Eff. 11–12–71. (This is Defendant's N of 5–3–79 and will hereafter be cited only by reference to ordinance section numbers.) The expressed intention behind the R–1A zoning district is as follows:

"This zone is intended primarily for low density, single family residential use, agricultural and large scale 'open land' types of use where major municipal improvements are not economically feasible." (Ord. § 20.071(a)).

Based upon the testimony produced, and personal observations by the court, the general character of the area where the plaintiff's land is located may best be termed as agricultural. The soil in this area is of a sandy or sandy loam type. TR. July 12, 1979, at 73. While crops are cultivated in the area, the land is not very productive and is at best characterized as marginal farmland. The testimony before the court indicates that the plaintiff in his farming operations would break even in some years, or enjoy a slight profit in others. TR. 3–1–

79, at 50, testimony of White; TR. 11–2–78, at 11–12, remarks of Mr. Marti.

In connection with his farming operations the plaintiff sought and obtained a permit from the defendant to engage in sand mining on the property on July 9, 1975. This is a use which is permitted under the ordinance. This use, however, is found in the definition section of the ordinance, § 20.025, and not the sections dealing with the residential zones. The residential zones are described in some detail, with permitted principal uses and accessory uses being stated for each zone.

Several conditions were placed on the sand mining permit issued by the defendant. One of these is a limitation to one five acre site at a time for any sand removal. Ord. § 20.515(E). The ordinance contemplates that one five acre site will be closed (that is filled in) before another five acres is opened. The permits have a one year life, and have been renewed every year by the defendant prior to this lawsuit.

On June 10, 1976 the plaintiff filed for relief under Chapter XIII of the Bankruptcy Act of 1898, as amended, 11 U.S.C.A. §§ 1001–1086 (1970 and Cum.Supp.1979). The plaintiff is a wage earner within the meaning of Chapter XIII as an employee of White Birch Park, Inc., a mobile home park currently in Chapter XI and in which the plaintiff and his wife are the sole stockholders. See *Matter of White Birch Park, Inc., (Associated Midwest, Inc. v. White Birch Park, Inc.)*, 471 F.Supp. 159, 165 (E.D.Mich. 1979).

The plaintiff has a beneficial interest in a contract between Urban Excavating, Inc. and General Motors Corporation. The contract calls for the removal of approximately 330,000 cubic yards of "foundry sand" from two General Motors metal casting plants in Saginaw, Michigan. Urban will remove this material, for a fee, and place it on the plaintiff's property located in the defendant township. The plaintiff will be paid a sum 75¢ per cubic yard, based upon the amount of the material which is placed upon his land. The effect of the contract will be to enhance both the Chapter XIII estate and

the Chapter XI estate. TR. March 1, 1979, at 51, 52, 67–8; TR. March 30, 1979, at 31.

"Foundry sand" is an industrial by-product. The process begins with lake sand which is used to make molds. These molds, in turn, are used in the iron casting process by General Motors. After use, the molds are broken, and water is added as a means of moving the sand. In addition, particulate matter which is removed from the air, under various clean air standards, is added to the water. Certain chemicals are added to facilitate the settling of suspended particles. The material which remains after settling and the removal of the water is what is known as foundry sand. Testimony of Gerald E. Calhoun, Staff Engineer, Environmental Facilities & Engineering Department, Chevrolet Motor Division, General Motors Tech. Center, TR. July 10, 1979, at 42–51.

The original complaint in this suit was filed by the plaintiff on August 14, 1978. The critical allegations of that complaint are: that the defendant unreasonably restricted the plaintiff's land mining operations; that the defendant has no ordinance which proscribes the type of fill material plaintiff may place on his land in order to comply with the requirement of the defendant's ordinance that the holes created by sand mining be filled in; and that the defendant had attempted to enjoin plaintiff's operation in a suit filed in Saginaw County Circuit Court without first having obtained leave of this court. See attached appendix 1.*

The court's impression is that the initial suit was brought because the defendant's limitation of five acres was thought to be unreasonably restrictive. The plaintiff alleged that a high pressure gas pipeline traversed the five acres designated by the defendant's agents which effectively prevented the use of heavy machinery in carrying out the sand mining operation. The defendant had refused to allow the operation to be enlarged.

This court, on August 14, 1978 entered a temporary restraining order under the authority of Federal Rule of Bankruptcy Procedure (F.R.B.P.) 13–401 which prevented the defendant from going forward with its state court action and prevented the imposition of the five acre limitation on the plaintiff's property or from otherwise interfering with the plaintiff's use of his land without permission of this court.

On September 15, 1978 the defendant filed an answer to the initial complaint. Part of this answer included an "Affirmative Defense" which alleged that

". . . the relief sought by the Plaintiff is not authorized by the Bankruptcy Act of the United States insofar as it prays that this court restrict the power of a Municipal Government of the State of Michigan to enforce its Criminal and Police Power Ordinances in the protection of the Health, Safety and General Welfare of its residents." See attached Appendix 2.

On October 11, 1978 this court denied a motion made by the defendant on that date objecting to the jurisdiction of this court, and on October 17, 1978 an order was entered stating that the defendant

". . . by filing an Answer to the plaintiff-debtor's Complaint, joining issue with the plaintiff-debtor, did thereby waive its right to object to the jurisdiction of this court" (Attached Appendix 3). See F.R.B.P. 915, 112 and Federal Rules of Civil Procedure (F.R.C.P.) 12, 15. A notice of appeal to the District Court was not filed until June 20, 1979, which included, among others, an objection to jurisdiction.

At a hearing held November 22, 1978 this court continued its restraining order preventing the defendant from proceeding with its state court action, or from interfering with plaintiff's use and possession of his property pursuant to the land mining permit issued to the plaintiff, pending a full hearing. Plaintiff was prevented from excavating or disturbing his land beyond a designated ten acres and from using fill dirt

* Editor's Note: The appendix material referred to throughout the opinion has been omitted from publication. Such material is available from the Clerk of Court.

which is a waste product of foundry operations. On January 2, 1979 this court signed a written order to this effect.

After the filing of additional pleadings by both parties, and four hearings relative to the original bill of complaint, an amended complaint was filed on February 28, 1979. This is attached hereto as Appendix 4.

The amended complaint set out several facts in addition to those already alleged. These include: the issuance by the Michigan Department of Natural Resources (DNR hereafter) of a solid waste disposal area license number 4917 on December 12, 1978 (A copy is attached as Appendix 5), which permitted the deposit of foundry sand on a twenty acre portion of plaintiff's property; the failure to "evolve procedures" by the defendant to approve or disapprove of foundry sand deposit sites (which fact was subsequently established by testimony and evidence produced at trial); the filing of an application and bond for a soil erosion and erosion and sedimentation control permit with the defendant.

The response of the defendant admitted that the plaintiff had filed for a soil erosion permit. The answer to the amended complaint also affirmatively states that procedures had been adopted by the defendant. The testimony at trial tended to show that while procedures or rules had been adopted by the defendant, this did not occur until well after the suit was begun. This point will be discussed in greater detail below.

This court, on March 30, 1979 modified the written order of January 2, 1979. The modified order continued to restrain the defendant's state court suit and interference with the designated ten acre excavation site. The March 30 Order also permitted the deposit of foundry sand upon a ten acre portion of plaintiff's land until completion of the trial and a decision by the court.

After a considerable amount of time before this court in the nature of Rule 205 examinations, which the parties agreed would become part of the trial record, this matter was tried July 10–16, 1979. The court reserved decision pending the submission of briefs and proposed findings of fact by the parties, which have been filed.

The record made before this court is most extensive. The pleadings and briefs alone run for several hundred pages. Twenty-four witnesses were heard by the court over a total of twenty-two days. Extensive documentary evidence, including numerous photographs was produced. This court has, with consent of the parties, also personally visited the site in question. All proceedings in this matter have been recorded, the testimony being in excess of one thousand nine hundred pages which the court has carefully reviewed in the preparation of this opinion.

II

Question Presented

After a careful review of the entire record, the critical question here is whether there existed a zoning ordinance in Bridgeport Township which regulated the deposit of foundry sand as proposed by Bus White. Although other issues were argued and evidence adduced, at times the parties going to great length to do so, these are not dispositive of, or relevant to, the essential problem presented to this court. Many of the side issues were for the most part time consuming and added little or nothing of probative value to the record. Example: the inordinate time spent on the question of adequacy of drainage at the site. The question, based on the lengthy record made, was essentially time wasted as the issue was resolved beyond any doubt by the Saginaw County Road Commission when, as part of its regular maintenance program it cleaned and deepened the ditches in question.

For analytical purposes, the following may serve as a guidepost for the discussion which follows. In reaching a conclusion as to the existence of an ordinance which would regulate or proscribe the deposit of foundry sand, inquiry will be made into the language of the ordinance; rules of statutory construction; definition of landfills; actions by governmental officials; potential for overlap between state and local regulations; changes of position by the defend-

ant; public pressures which were brought to bear; and toxicity.

## III

## Discussion of Law & Facts

### A. Does Defendant's Ordinance Regulate the Deposit of Foundry Sand?

■ This question, having arisen in connection with a Chapter XIII estate being administered by this court, and the defendant having filed answer thereto and made demand for affirmative relief, confers on this court jurisdiction of the controversy.

In situations such as this, the rule for interpretation calling for reference to the laws of the State of Michigan is so basic that reference to stare decisis is unnecessary.

■ The briefs supplied by the parties, and the court's own research, indicate that there are few "absolutes" in connection with such zoning questions. One writer has, this court believes, summarized accurately a basic approach to these questions:

"Since general statements do not provide an adequate basis for determining zoning disputes, it is necessary to look elsewhere. The Supreme Court (of Michigan) has frequently stated that each zoning case must be determined on its own merits." Crawford, *Michigan Zoning and Planning*, § 7.01, at 7–4, 7–5 (1967 and Cum. Supp.1974). *See also Long v. City of Highland Park,* 329 Mich. 146, 45 N.W.2d 10 (1950); *Ervin Acceptance Co. v. City of Ann Arbor,* 322 Mich. 404, 34 N.W.2d 11 (1948).

While some guidance may be provided by the decisions reached in prior cases, the result reached in this case muse be one which is proper in light of its particular circumstances. This, to a greater or lesser degree is the rule in all such matters owing to the infinite number of ways in which zoning questions can arise.

### 1. The Township Ordinance

The record in this matter is clear that of the ten zoning districts provided for in the defendant's ordinance, only two are relevant to this suit. One of. these is the district in which the plaintiff's property is located, "R–1A". The other is the district which the defendant asserts that filling operations are restricted to, "M–1".

### a. R–1A Zone

The R–1A zone is described by the defendant's ordinance being

". . . intended primarily for low density, single family residential use, agricultural and large scale 'open land' types of use where major municipal improvements are not economically feasible." Ord. § 20.071(1)(a).

Within the R–1A district there are seven enumerated categories of permitted principal uses. These include single family residences, farms, churches and schools, hospitals, community buildings, outdoor exercise and recreational facilities, and community garages. Ord. § 20.071(1)(b).

In addition to the above referenced principal uses, certain accessory uses are also permitted. The ordinance however, speaks of

"accessory buildings or structures used customarily incident to any of the permitted principal uses." Ord. § 20.072(2)(a).

This section continues by stating that "automobile trailers or similar portable dwellings or tents"

are not to be considered as legal accessory uses, and further that

"junk yards and buildings or structures for the dismantling of automobiles are expressly prohibited" Ord. § 20.072(2)(a).

The description of the R–1A zone contains several examples of ambiguous or conflicting language. The term "community garage" is not defined or described in any part of the ordinance. Several quite different meanings may be ascribed to this term, all with equal validity. The section describing the R–1A zones nowhere refers to landfill or landmining operations as either a principal or accessory use. Yet language in other sections of the ordinance suggests that a total exclusion of landmining is not

contemplated. Junk yards and acceptable outdoor exercise and recreational facilities are described in some detail, however.

Apparently, under the defendant's ordinance, a sand or gravel pit is considered to be a farm use if it is combined with a "bona fide farm operation on the same continuous tract of land." Ord. § 20.-025(0).

This statement is found in the definition section of the ordinance. The section contains a complete description of a "farm" and the types of activities which are permitted on a farm. While "gainful agricultural purposes," the operation of greenhouses, nurseries, orchards, chicken hatcheries and apiaries are always considered farms, the raising of fur-bearing animals, game, fish hatcheries, stock yards, recreational parks, animal feeder operations, stone quarries or gravel or sand pits are acceptable farm activities only if they are combined with bonafide farming operations on the same land. The court notes, however, that the phrases "bonafide farm operation" and "gainful agricultural purposes" are not defined. As is the case with "community garages", several meanings or no particular meaning may be attached to these terms. The "bonafide" or "gainful" aspect of the farm definition would seem to preclude a farm which operated at a loss or only broke even. This meaning also appears to be at odds with some of the descriptions found in federal law, see, e. g., §§ 182, 183 of the Internal Revenue Code, 26 U.S.C.A. §§ 182, 183 (1978) and § 501(b)(1) of the Housing Act of 1949, 42 U.S.C.A. § 1471(b)(1) (1978). This ambiguity is also found in state law, Mich.Comp.L.Ann. § 213.321 (Cum.Supp. 1979); Mich.Stat.Ann. § 8.215(61) (1977) (Relocation Assistance for Displaced Persons) and Mich.Comp.L.Ann. § 554.702 (Cum.Supp.1979); Mich.Stat.Ann. § 26.-1287(2) (Cum.Supp.1979) (Farmland and Open Space Preservation Act).

b. *M–1 Zone*

The Industrial Districts of the defendant are classified in an M–1 zone. This zone "is intended for industrial use, but also permits commercial establishments not engaged in retail sales, and service establishments which are of a type not generally requiring the customer to call at the place of business. It is also intended to prohibit residential uses and intensive retail enterprise as being incompatible with the primary industrial and related uses permitted" Ord. § 20.230(A).

There are five categories of permitted principal uses in this zone. They include: the production, processing and distribution of materials, goods and other finished and semi-finished products, retail activities being expressly prohibited; trade or industrial schools and veterinary hospitals; public utilities; truck terminals; contractor establishments not engaged in retail sales on the site. Ord. § 20.240(B).

In addition to the permitted principal uses, there are five enumerated accessory uses and sixteen uses which are permitted by special use permit. The accessory uses permitted are those which are "clearly subordinate to the main use," including: management offices, employee eating facilities and caretaker's residence; storage for building materials and contractor's equipment; off-street parking; public owned and public utility buildings; and retail sales where "incidental to the main use" and where the sales are "not more than 10% of the gross profit of the operation." Ord. § 20.250(C). This last statement of retail use, in 20.250(C), appears to be in direct conflict with the express prohibition of retail activities in 20.250(B).

Under a special use permit, the following are allowed: junk yards; sewage treatment; incinerators and sanitary landfills; manufacture of glue, acid, actylene gas, celluloid, cellulose or plastic, chlorine, creosote, explosives and fertilizer; operation of a crematory except in connection with a cemetery; petroleum refining; incineration, or reduction of dead animals, offal, garbage or refuse other than offal, garbage or refuse collected and used on the same premises; storage of junk, including automobiles, provided stated measures are followed to reduce off premise effects; and any other use

comparable in character or by-products of the enumerated uses. Ord. § 20.260(D).

### 2. Rules of Statutory Construction

Since the M–1 zoning classification expressly allows "sanitary landfills" with a special use permit, the issue is whether all landfill activity is restricted to the M–1 zone alone, or, to put it another way, excluded from the R–1A zone. (Note Defendant's position on p. 669.)

■ The maxim of law which applies in situations such as this is derived from antiquity. *Expressio unius est exclusio alterius.* The express mention in a statute of one thing implies the exclusion of other similar things. *Sebewaing Industries, Inc. v. Village of Sebewaing,* 337 Mich. 530, 545, 60 N.W.2d 444 (1953); *Marshall v. Wabash Ry. Co.,* 201 Mich. 167, 172, 167 N.W. 19 (1918); *State Farm Ins. Co. v. Traycik* (Rem.), 86 Mich.App. 285, 292, 272 N.W.2d 629 (1978).

■ The rule is apposite to the case at bar. The defendant's ordinance refers to "sanitary landfills" as being permissible in the M–1 zone with a special use permit. From the language used it is clear that a sanitary landfill can only be located in an M–1 zone by way of a special use permit. Due to the nature of this activity it is very understandable that the defendant is concerned over such operations. Other types of landfill operations, not being expressly restricted to the M–1 zone, may be located elsewhere. This, of course, presupposes that there is a difference between sanitary and other types of landfills.

#### a. What is a Landfill?

To a certain degree, the term "landfill" is a term of art. The scope of activities which fall under this general heading can be quite large. Anything from piling beach sand upon a low place in the ground in order to raise surface to the permanent storage of radioactive waste materials may be included.

■ The defendant's ordinance is quite specific. The language used is "sanitary landfill." The meaning of this phrase is limited, and only a particular type of fill material is referred to. Common sense and everyday usage would indicate that garbage (*i. e.* offal or refuse of animal or vegetable matter) is what is intended. Indeed, a "sanitary landfill" is simply a euphemism for a garbage dump. *Municipal Sanitary Landfill Authority v. Hackensack Meadowlands Development Commission,* 120 N.J.Super. 118, 293 A.2d 426 (1972). Based upon the testimony in this proceeding, foundry sand is definitely not the same type of material as garbage.

In Michigan, garbage and refuse disposal must be licensed by the Michigan DNR as well as comply with local regulations, if any, per 1965 Pub.Act No. 87, codified at Mich.Comp.L.Ann. § 325.291, et seq.; Mich. Stat.Ann. § 14.435(1), et seq. Act 87 was the regulation applicable when this suit was commenced. It has since been superceded by 1978 Pub.Act No. 641, codified at Mich. Comp.L.Ann. § 299.401 et seq.; Mich.Stat. Ann. § 13.29(1), et seq.

During the course of this suit, the following discussion took place between Mr. Petersen, the plaintiff's attorney, and Mr. Gerald E. Calhoun, a staff engineer, environmental facilities and environmental engineering department, Chevrolet Motors Division, General Motors Technical Center.

"Q And will you describe what tests were conducted and what you found with regard to the tests?

A I don't quite understand your question.

Q Well, how the materials (foundry sand) shaped up in this matter?

A Well, I think the data that we show for leachate as compared with the drinking water standards in the proposed RCRA times ten values shows it's non-hazardous type of material.

Q How do you use the term hazardous here?

A Well, this term hazardous is a rather nebulous term, and it depends on what your definition of it is, and, of course, this hasn't been established definitely yet by any of the regulatory agencies.

Q I am trying to avoid testifying myself on how you use the term. Some people equate it with radioactive material and some people attach less import to it. How do you define it? Let's get a definition of terms, if you will. How do you define this?

A Hazardous, in my opinion, would be something that would have an opportunity to be harmful to health or the environment. In other words, it could be, create fish kills or create conditions in ground wells which would be adverse to public health.

Q And your conclusion with respect to this material that this is non-hazardous, is that correct?

A Yes, sir."

TR. July 10, 1979, at 36–37.

Testimony was also presented to this court from Leonard Zulewski, an environmental sanitarian for the Resource Recovery Division, Region III, Michigan DNR. Mr. Zulewski was the individual responsible for the approval of the state license for plaintiff's land. Zulewski approved plaintiff's site for the dumping of building materials (TR. October 11, 1978, at 43) and would have granted the permit to use the site as a fill (TR. October 11, 1978, at 13). It was further testified to that the foundry sand was the "best quality" that the witness had seen, and that it would be suitable for use as fill material under DNR standards. (TR. October 11, 1978, at 12).

The record also includes a colloquy between the defendant's attorney, Mr. Marti, and Dolores Montgomery, a hydrogeologist with the Resource Recovery Division, Region III of the Michigan DNR. Mrs. Montgomery testified that sites such as the plaintiff's are classified as Type 3 sites. These are sites which may receive materials of lesser potential danger than heavy metals and sanitary landfills (types 1 and 2) but which are rated somewhat higher than type 4, inert materials. See TR. April 27, 1979, at 62–3.

■ From the record made by these expert witnesses, and the common usage of the term "sanitary landfill" it is clear to this court that a deposit site for foundry sand is not properly characterized as a sanitary fill. If it were, the restriction of foundry sand deposit sites to the M–1 district would be appropriate. Since only sanitary fills are mentioned in the defendant ordinance, the implication is that such fills may only exist in the M–1 zone. Other types of fills, not being expressly listed under the M–1 district, are not restricted to it.

Apart from a reading of the ordinance, there are additional reasons for such conclusion, as the next following demonstrates.

3. *Acts and Statements of Township Officials*

John F. (Jack) Lee, is the building inspector, and the chief enforcement officer of the defendant's zoning ordinance. Mr. Lee stated his belief that the defendant's ordinance did not deal with the deposit of foundry sand:

Mr. Petersen: Now, as building inspector, I take it, during the past four and a half years it was your task to pass upon the various building sites in the community that had been constructed?

Mr. Lee: Yes.

Q. And you are familiar, are you not with some of the materials that went into those building sites?

A. Yes.

Q. Does Bridgeport Township have any ordinance that prohibits the dumping of foundry sand on any building site?

A. No.

Q. Have you ever been called upon by the Township authorities to prohibit the dumping of foundry sand on any building site?

A. No.

TR. May 3, 1979, at 54.

Lee went on to testify that, in fact, foundry sand had been used on many building sites as fill material in the past. TR. May 3, 1979, at 58–9, 63. He continued that the plaintiff's application for a permit to deposit foundry sand was treated differently from others

"because it's involving something we have never had in the Township, which is foundry fill." TR. May 3, 1979, at 83.

As will be discussed subsequently, the record is clear that other foundry sand deposit sites do in fact exist in Bridgeport. According to Ord. § 24.071 at least some of these other sites would be subject to prior approval of the building inspector since one or more acres of land would be disturbed. At least one should have been known to the defendant as it involved fill for the new township offices. Since all buildings require a permit from the defendant, it is fair to presume that the other sites were also known to the defendant. See Ord. § 24.071. It is clear that foundry sand is not ". . . something we have never had in the Township . . . ." From these facts, it may be fairly inferred that either the defendant did not believe that any ordinance applies to such activity, or if there is an ordinance that there was no need to require compliance. The effect is the same. Even if an ordinance would apply to the instant case, the record is persuasive that a permit under Ord. § 24.071 should be granted to the plaintiff if he is entitled to equal treatment by the defendant.

The court has also heard the testimony of John (Bud) Gilmour, the superintendent of Bridgeport Township. Mr. Gilmour stated that there was no ordinance to cover the deposit of foundry sand prior to March 6, 1979 when the Township Board directed that such an ordinance be prepared. TR. May 29, 1979, at 29; see also the attached Appendix 6, the minutes of the Bridgeport Charter Township Board regular meeting, held March 6, 1979.

There is also an admission by Mr. Marti, the defendant's attorney in this suit, that there was no ordinance governing the deposit of foundry sand within the Township. TR. November 2, 1978, at 7, line 25 and 8, lines 1–8. It is noteworthy that Mr. Marti is also the regular township attorney for Bridgeport. As this court understands such relationships, city attorneys, and the like, have very good working knowledge of their local ordinances. The opinion of the township attorney is more credible than that of a layman or another attorney, and this court finds this to be particularly persuasive.

More to the point than the statements made by the defendant's officials and agents, are the actions taken (or not taken) by these individuals. While the location and operation of fill sites may be one of legitimate concern for a unit of local government, the defendant has engaged in a course of conduct which indicates a total lack of concern in this area. Lee, the defendant's building inspector, testified that foundry sand had been used in the construction of the Bridgeport Shopping Center parking lots; the Bridgeport Township Hall; the A & P Shopping Center; Grant's Super Foods; and the Lumber Mart. TR. May 3, 1979 at 58–64.

While the record is incomplete in this area, there looks to have been some inconsistency in the defendant's position in this regard. Under the Ordinance, § 24.071, the building inspector would have had to issue soil erosion and sedimentation control permits to each of the above sites. The record does not disclose whether or not this was done. If it was done for these other sites, the record made shows that drainage and erosion to be no problem on the plaintiff's site and the permit should have been issued to the plaintiff. If the other sites were not licensed for soil erosion, then it is most inconsistent to now seek to require a permit for the plaintiff's property.

Mr. Zulewski, the environmental sanitarian for the DNR responsible for the area of the state where the defendant Township is located, has testified that foundry sand was also used in the construction of access ramps to Interstate 75 which passes through the Township. The State neither asked for nor received a permit. Mr. Zulewski indicated that according to his files Bridgeport had never applied for a permit for the operation of solid waste disposal sites which exist in Bridgeport. (That is, the Township Hall and other sites described above which under applicable law would be considered disposal sites.) TR. October 11, 1978, at 13–14. The court notes that such a

license was applied for and issued to the plaintiff Bus White by the State of Michigan.

Based upon the language of the ordinance and the conduct and statements of the defendant's officials and agents, one thing becomes unmistakably apparent. The only type of landfill activities which are intended to be regulated are sanitary fill operations. Other kinds of fills have not been licensed or restricted in the past. The tolerance of the defendant towards foundry sand fills in the past leads one to believe that the attempt of the defendant to now impose regulations on the plaintiff appears to be, at the very least, an attempt to institute new policies aimed primarily at the person of the plaintiff, and not so much at the kind of activity which the plaintiff is engaged in. Admittedly, however, the defendant's opposition could have been generated in response to pressure from a small but vocal "environmental" group.

**4. State Licenses and Local Ordinances; the Applicable Standards.**

Counsel for the defendant have commented on more than one occasion that there was no intention on the part of the Michigan legislature to pre-empt the right of local governmental units to act in an area covered by Act 87. Looking to the language of Act 87 this can clearly be seen.
"Sec. 2

No person shall dispose of any refuse at any place except a disposal area licensed as provided in this act. Nothing in this act shall usurp the legal right of a local governing body from developing and enforcing local ordinances, codes, or rules and regulations on solid waste disposal *equal to or more stringent than* the provisions of this act, nor will this act relieve the applicant for [a] license to operate a disposal area from obtaining a license from a local governing body *when required* or relieve the person owning or operating a disposal area from responsibility for securing proper zoning permits or complying with all applicable local ordinances, codes, or rules and regulations

not in conflict with this act." Mich. Comp.L.Ann. § 325.292 (1975); Mich.Stat. Ann. § 14.435(2) (1976), emphasis added.

The above quoted statutory language which has been emphasized is of particular significance in interpreting Act 87. It indicates a reservation by the state of Michigan of the right to license solid waste disposal, subject only to reasonable restrictive legislation which might be adopted by a local governmental unit.

In this case, the defendant was empowered by Act 87 to enact rules "equal to or more stringent than" the state provisions. The record made before this court, however, shows that no regulations were adopted. Assuming for the moment, that some kind of local rule was in force, the unfettered operation of other filling activities within the Township would counterindicate the enforcement of such regulations in the instant case. To so enforce a local regulation against the plaintiff and not others would be clearly discriminatory action on the part of the defendant.

The words "equal to or more stringent than" in the statute also works to establish a minimum standard. While a local governing body may set a tougher standard, it cannot be more lenient. The language used in Act 87 is permissive. The local governing body may, or may not, adopt their own standards. If they are adopted, then they cannot be *less* restrictive than the state statute.

Finally, it must be pointed out that if required, the plaintiff must comply "with all applicable local ordinances." From the foregoing discussion of the various zoning districts and the nature of the land-filling activities, it is evident to this court that there are no other applicable local ordinances which would operate to prevent the operation of plaintiff's foundry sand deposit site. There may be, however, other regulations such as hours of conducting business and the like which do apply in this case. Since these are not in the record made before this court, no finding is made as to the other regulations apart from the fact

that if they exist, there should be compliance by the plaintiff.

### a. Interpretation by the Michigan Courts

#### i. Act 87

The language of section two of Act 87, which is set out above, has also been the cause of some conflict in the Michigan state courts. On at least five occasions since 1970 the question of the right of a local governmental unit to regulate or deny operation to a landfill licensed by the state has reached the Michigan appellate courts.

The earliest decision was that of *Waterford Processing & Reclaiming Co. v. Twp. of Waterford,* 25 Mich.App. 507, 181 N.W.2d 675 (1970), leave to appeal denied 384 Mich. 768 (1970). The facts of the *Waterford* case are that after the plaintiff received a sanitary landfill license from the DNR, the township denied a permit to operate, asserting potential pollution problems. The court of appeals noted that consideration of possible dangers of water contamination and pollution were part of the inquiry made in the issuance of the state license. On the grounds of pollution, the state has preempted local ability to act. The Michigan Supreme Court, it should be noted, denied a leave to appeal in this case. The gist of this case is that while the local governing body may impose additional regulations to those imposed by the DNR, what the state has permitted, the township cannot prohibit. In the instant case as has been shown, supra, the plaintiff has been issued a license by the DNR. The most the defendant could now do, would be to enforce more stringent rules, if such existed, and were reasonable.

The most recent discussion of Act 87 is found in *Michigan Disposal, Inc., v. Augusta Twp.,* 89 Mich.App. 557, 280 N.W.2d 596 (1979). The *Michigan Disposal* case analyzed the *Waterford* and all subsequent cases in reaching a conclusion of law. The court held that once the state has determined that no danger of pollution exists the local government may not use the excuse of potential pollution as a reason for denying a permit. The local governmental unit may refuse a permit, however, if based upon facts not considered by the state authorities. See 89 Mich.App., at 563, 280 N.W.2d 596.

Applied to the case at bar, the aforestated rule would prohibit the defendant from denying a permit to the plaintiff due to environmental concerns. Other factors, however, if the ordinance had regulated the deposit of foundry sand, could be used to prevent the operation of the plaintiff's deposit site. The one reason stated during the course of these proceedings, apart from fear of pollution, was the fear of decreasing property values in the area.

#### ii. Zoning

Before continuing with a discussion of the fear of decreasing property values as a basis for zoning decision, an analysis of the current zoning standards is appropriate.

There are two principles or tests which may be used to ascertain the validity of zoning, and four rules to follow in applying the principles. These were first stated in this form by the Michigan supreme court in *Kropf v. City of Sterling Heights,* 391 Mich. 139, 215 N.W.2d 179 (1974). This standard has been recently re-affirmed by *Ed Zaagman, Inc. v. City of Kentwood,* 406 Mich. 137, 277 N.W.2d 475 (1979).

In order for a challenge to a zoning ordinance in Michigan to be successful, the plaintiff must prove either:

1. that there is no reasonable governmental interest being advanced by the present zoning classification itself; or

2. that the ordinance is unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question

The four rules for applying the above stated principles are:

1. that the ordinance is presumed valid;

2. the attacking party must establish that the ordinance is an unreasonable and

arbitrary restriction upon the owner's use of his property;

3. the attacking party must establish that if the ordinance is enforced, the consequent restrictions on the property precludes its use for any purposes for which it is reasonably adopted;

4. the appellate court is to give considerable weight to the findings of the trial court in equity cases.

In the instant case this court, in addition, must decide whether defendant's zoning ordinance does indeed, by its terms and intent, regulate or govern the deposit of foundry sand.

Applying the principles to the instant case, to prevail the plaintiff must show either that no reasonable governmental interest is served by the R–1A classification, or that the R–1A classification is, as to the plaintiff, arbitrary, capricious and unreasonable in its exclusion of legitimate land uses. It is this second ground which serves to defeat the ordinance, if indeed, the provisions of the ordinance were held to apply to plaintiff's use.

In applying the four rules to the unreasonable exclusion of legitimate land uses principle, the following is seen in light of the facts and the circumstances of this case. One, the overall validity of the defendant's ordinance was never challenged, only its application in relation to the plaintiff's farm property.

Two, for reasons already discussed (namely a strict construction of the ordinance, the actions of township officials) and to be discussed (the reasons for the zoning decision of the township as reflected in the record) the ordinance operates to unreasonably restrict the use of plaintiff's land. Plaintiff's Exhibit 5 of 7–10–79 is particularly persuasive on this point. (This is attached hereto as Appendix 7). This is a statement of policies and procedures for the deposit of foundry sand which was approved by the defendant's Township board in April of 1979, well after this suit was begun. (TR. May 29, 1979 at 37–8).

This exhibit indicates that the current M–1 zones are too small for practical use as landfills. It also points out that a foundry sand landfill will have a limited life, and a re-zoning to M–1 would be inappropriate. While the observations are correct, the problem lies in the attempt to enforce this *ex post facto* rule against the plaintiff. U.S.Const., Art. 1, § 10.

The third rule, that enforcement of the ordinance against the plaintiff's property will restrict uses for which the land is reasonably suited has also been met. As discussed above, the plaintiff's farm is only marginal at best. From the testimony before this court it is clear that whatever uses are allowed on plaintiff's land now, will be equally acceptable when the fill site is completed. In short, the land is reasonably suited to serve as a foundry sand deposit site. And this use will not affect in any appreciable way any other use for which plaintiff's land is suited under the ordinance after the fill is completed. The fourth rule, of course, does not come into play in the determination of this court.

After applying the *Knopf* and *Zaagman, supra,* rules to this case, it becomes unmistakably clear that the ordinance of the defendant does not operate to restrict the use which plaintiff wishes to put his land.

### b. *Aesthetic Considerations*

 It appears to be fairly settled law in Michigan that "[a]esthetics may be an incident but cannot be the moving factor" in zoning decisions. *Wolverine Sign Works v. City of Bloomfield Hills,* 279 Mich. 205, 208, 271 N.W. 823, 825 (1937). *See also Detroit Edison Co. v. City of Wixom,* 382 Mich. 673, 172 N.W.2d 382 (1969); *1426 Woodward Ave. Corp. v. Wolff,* 312 Mich. 252, 20 N.W.2d 217 (1945); *Central Advertising Co. v. Ann Arbor,* 42 Mich.App. 59, 201 N.W.2d 365 (1972), rev. and remanded 391 Mich. 533, 218 N.W.2d 27 (1974).

This is a well reasoned rule. By its very nature, aesthetic concerns are not static. What is considered ugly today, may well be fashionable tomorrow. Zoning decisions which are based upon the likes and dislikes of a community would have to be constant-

ly altered in order to properly reflect the tastes of the community.

An inordinate amount of time was spent by defendants concerning the effect on the residents of the township of a mound of sand of the size contemplated by the plaintiff. The two community planners, expert witnesses called by the defendant ventured much subjective testimony, even to the point that apples grown on the mound would not sell because of the fear in peoples' minds that the apples might be tainted. TR. July 13, 1979, at 121–2.

The record made in this matter is replete with references to aesthetics. See testimony of Alan Kundinger, Chief Planner, Spicer Engineering Company, formerly director for the Saginaw County Metro Planning Commission. TR. May 7, 1979, at 31–32; testimony of John Mersman, Director of Saginaw County Metro Planning Commission, TR. July 13, 1979, at 88–90. Mr. Mersman further testified that the purpose of zoning was to guard against the mental fears of the residents in the area. TR. July 13, 1979, at 121–2. It is obvious to this court that aesthetics played an improperly large role in the decisions made by the defendant.

Reference should be made to the testimony of both Mr. Mersman and Mr. Kundinger. If given objectively, their opinions and observations could have been helpful to the court and both litigants. However, both witnesses became active advocates for the defendant. This in itself might be expected because of their relationship, past and present, to the defendant as is revealed by the record. Bias, under the circumstances, is not unusual, and, properly discounted, should not destroy such testimony. However, the demonstrated determination to speak only for the defendant, which, in many instances, led to absurd statements, left little of probative value to apply to this case. The penchant of defendant's counsel to overuse of leading questions may have contributed.

For example, Mr. Kundinger, in response to a question posed by defendant's counsel opined that the mound of foundry sand on plaintiffs' premises, limited by license to 23' in height, appeared to be about the same height as the power lines traversing the premises, 55 feet in height. Compare TR. May 29, 1979, morning portion at 70–79 and TR. July 16, 1979, at 2 with Court's Exhibit 18 of 7–19–79 (attached Appendix 8).

An inordinate length of time was spent on the aesthetic factor of the 20 acre mound of sand which would be over six hundred feet from the nearest road, Dorwood, and largely visible only from that point. Bearing in mind that the mound would be limited to 24' in height including one foot of top soil, seeded with grasses, etc., as directed by plaintiffs' license and site plan (See Appendix 5, the DNR license, stipulation 1.a), and Debtor's Exhibit 5 of 3–1–79, construction note 9, the site plan for Bus White's property, when it is finished, certainly would be no more aesthetically unappealing than a 20 acre barn or stockyard, both permitted by the ordinance.

This, in the light that the ordinance does not proscribe the height of such buildings, emphasizes the absurdity of the opinions of the two experts.

### 5. Conflicting Positions of Defendant

Presuming, for the sake of argument, that there was a valid regulation in force in the defendant township, the way in which the defendant attempted to enforce such regulation must be reviewed. The statements of counsel and witnesses in this matter would tend to show that the ordinance was being selectively applied to bar the plaintiff from the use of his property.

Mr. Marti stated to the court quite early in these proceedings that the defendant would not object if beach sand were being deposited on plaintiff's premises. TR. November 2, 1978, at 10. Mr. Kundinger testified that a natural hill on plaintiff's land would not be objectionable, but a man-made one would. TR. May 29, 1979, at 32–4. Mr. Mersman stated that the height of the hill, and not the composition of it makes it improper. TR. July 13, 1979, at 88–90. In his attempts to comply with local rules the

plaintiff was told that his use was not permitted, and also that there was no rule against the use. TR. July 11, 1979, at 46–65. Further, the township superintendent, Mr. Gilmour, reported that procedures concerning the deposit of foundry sand were not prepared until after April 19, 1979. TR. May 29, 1979, afternoon proceedings, at 37–8.

The actions of the defendant's officials show a change in position between the time this suit was commenced, and the date of trial. In November 1978 the mound was acceptable, as long as it was not foundry sand. In July 1979 any type of mound was no longer acceptable or "considered aesthetically pleasing" and that even a well landscaped site would not be aesthetically acceptable. TR. July 13, 1979, at 87–8. The multiple bases upon which the objections to plaintiff are based, which as stated are exclusive, serve also to underscore the impropriety of using aesthetics as a critical factor in the decision making process.

### 6. *Public Pressure*

Unfortunately, in this case outside public pressure was injected into the suit. Incidents of violence and property destruction have occurred, the plaintiff having suffered damage to valuable equipment. Attempts were made to embroil a state representative and senator as well as a U. S. Senator. Certain factions have also instituted a lawsuit, the basic subject matter being the same as the instant case, which is pending at this time, but enjoined by this court. These matters were not all brought out in the official record in this suit. Some have been recounted in the newspapers which serve this area and the court feels constrained to take note of these public occurrences.

In and of themselves, the foregoing observations are of no direct importance. But the Michigan supreme court has stated that local pressures and improper influences on governmental officials are proper subjects for the court to consider in determining whether or not a party has been deprived of procedural due process. *Brae*

*Burn, Inc. v. Bloomfield Hills,* 350 Mich. 425, 86 N.W.2d 166 (1957).

While it may only be inferred from the circumstances, there is great likelihood that the decision of the defendant's officials, over the course of this litigation, were to varying degrees influenced by some vocal residents. Even if these vocal individuals represented a view supported by a large number of township residents (and this was NOT established), it is still a settled principle of law that majority rule is limited by the requirement that individual rights be observed. *Ranjel v. City of Lansing,* 293 F.Supp. 301 (W.D.Mich.1969); *Otey v. Common Council of the City of Milwaukee,* 281 F.Supp. 264 (E.D.Wis.1968). The court recognizes that the foregoing authorities arose in the context of civil rights violations, but the principle is equally applicable in instances where there is an attempt to deprive a citizen of any of his rights.

### 7. *In re Toxicity*

The topic of toxicity is one which was much discussed before this court. Unquestionably the existence of potential dangers to public health, safety and welfare are valid reasons to proscribe activities. But as previously discussed, these factors were considered by the Michigan DNR in the issuance of the solid waste disposal area license. Also, the testimony in this case is convincing that foundry sand is non-hazardous. See above, pages 664–665. The stipulations on the license calling for monitor wells are designed to detect any problem. (See attached Appendix 5). On the basis of *Michigan Disposal, supra,* it would be improper for the defendant to prevent the plaintiff's operation due to health hazards. The court also refers to the decision in *Waterford Processing, supra,* as providing guidance in this case. The fact that the state supreme court denied review in *Waterford* is most persuasive as an indication of the correctness of the case. Since the state has found no hazard posed by the plaintiff's operation, the question is settled. See also TR. March 1, 1979, court's opinion, at 3.

### 8. *Pseudo Issues*

There were many additional points which were presented and argued at great length in this suit. These ranged from claims of damage to roadways to the number of houses with a given radius from plaintiff's property. While some of the points were interesting, the decision in this case is not contingent upon these secondary issues, and no further consideration will be given to them.

### 9. *Miscellaneous Matters*

On the whole, the witnesses presented by the plaintiff provided much credible evidence. The same is not universally true of some of the defendant's. Certain aspects of the testimony of Kundinger and Mersman, defendant's experts, are particularly suspect (see discussion concerning credibility above at page 670). While these gentlemen are undeniably experts in certain areas, their testimony in areas apart from their expertise is not as believable. The essential problem with their testimony was what the court perceives as the attempt to be experts on all questions addressed to them.

It should also be pointed out that the plaintiff stated under cross-examination that if he prevailed in this suit, he was willing to limit his use to the twenty acres licensed by the DNR. The plaintiff agreed to proceed no further than the twenty acres already in use. TR. July 11, 1979 at 114–5.

The defendant's attorney has also made his position clear in the event the defendant prevails in this suit. Due to the practical difficulties involved, the defendant would not seek removal of any foundry sand which was deposited during the pendency of this case. TR. March 1, 1979, at 60.

Finally, the record is most persuasive that no basic change in the character of the land will be worked by the plaintiff's activities. Uses which were permitted before plaintiff began his operation, will still be acceptable after plaintiff completes this site. One of the defendant's witnesses in this regard asserted that after the fill was complete, the land would be useless, a wasteland for all practical purposes. This view is extreme, and the court places no weight on it. TR. July 13, 1979, at 109–130. As had been characterized by plaintiff's attorney on several occasions the foundry sand fill is only a temporary use, for a limited period of time. When completed the character of the land will still be compatible with the requirements of the R–1A zoning district in which it is located.

### B. *Jurisdiction*

Defendants have also raised a challenge to the jurisdiction of this court. This matter was discussed in the opening section of this opinion. In connection with the objection, it was suggested that the plaintiff was prematurely before the court, that administrative remedies should first be pursued.

██ Under Michigan law, this question is fairly settled. The reasonableness of the exercise of police power under a municipal zoning ordinance is always subject to judicial review. *Long v. City of Highland Park,* 329 Mich. 146, 45 N.W.2d 10 (1949). This authority to make inquiry into such areas exists independent from any administrative remedies which may exist.

Since the question of subject matter jurisdiction is presently the subject of an interlocutory appeal to the District Court, it would be inappropriate for this court to make any additional findings at this time. Also in view of the pending interlocutory appeals, this court will make no further comment concerning the preservation of the *status quo* which defendant has also questioned.

### IV

### Summary

██ The zoning ordinance of the defendant Bridgeport Township does not operate to prevent the use of the plaintiff Bus White's property as a foundry sand deposit site. There are several reasons for this. The language of the ordinance does not lend itself to a construction that circumscribes the operation of all landfills. The words used are "sanitary landfills." This

terminology has a very precise meaning and refers to a particular type of fill material. Foundry sand is clearly not included in this.

Another consideration in reaching this conclusion is the understanding of the ordinance, established by testimony, held by the defendant Township officials charged with the enforcement of the ordinance. This includes the building inspector, the superintendent and the township attorney. At one time or another they all indicated that the Bridgeport ordinance did not cover the type of activity proposed by the plaintiff. See TR. May 3, 1979 at 54; May 29, 1979, at 29; November 2, 1978, at 7–8.

The state statute, Act 87, expressly permits the adoption of local rules of an equal or more restrictive nature, by local governmental units. Act 87 sets a minimum which could be raised by the local governing body. In this case, however, there are no local rules of any kind relating to the deposit of foundry sand, and consequently none which are equal to or stricter than the provisions of Act 87.

According to the decided cases in Michigan, there are two different avenues which lead to the conclusion that the defendant's ordinance does not apply here. One is represented by *Ed. Zaagman, Inc. v. Kentwood,* 406 Mich. 137, 277 N.W.2d 475 (1979); and *Kropf v. Sterling Heights,* 391 Mich. 139, 215 N.W.2d 179 (1974). This line of cases has been previously discussed. They hold that a successful challenge to zoning must show unreasonableness due to arbitrary or capricious exclusion of legitimate land uses. The other line of cases discussed above include *Michigan Disposal, Inc. v. Augusta Township,* 89 Mich.App. 557, 280 N.W.2d 596 (1979), and *Waterford Processing & Reclaiming Co. v. Township of Waterford,* 25 Mich.App. 507, 181 N.W.2d 675 (1970). These cases hold that once the state authorities determine that no dangers exist due to a given activity, local governmental units may not re-consider the same factors to bar the activity. As stated in *Waterford, supra,* "local regulations may not *exclude* what the state has permitted." 25 Mich.App. at 511, 181 N.W.2d at 677, emphasis in the original.

The record is most clear that the defendant's officials and agents were concerned primarily with aesthetics and property values. These considerations are valid ones, but they may not be the prime ones. To base an ordinance, or its enforcement, upon the tastes, likes and dislikes of a community is to have no ordinance. Styles and tastes change constantly and any rule founded on these must then also be in a state of continual change.

Finally, the decisions made by the defendant township officials in considering the plaintiff's property appear to be the result of extreme public pressure exerted by a few township residents, at least as much as upon any considerations of the rules. Such a situation where individual rights are trampled recklessly is not tolerable.

While the defendant's zoning ordinance does not prevent the operation of the plaintiff's foundry sand fill site, this does not mean that the plaintiff may operate with reckless abandon. Strict compliance with the state license restrictions must continue. The plaintiff must also be in compliance with the other laws of the defendant township or county which would otherwise apply. These provisions include, but are in no way limited to, the spring road weight limits and similar provisions.

The property rights of the neighbors of the plaintiff must also be respected. The operation of the deposit site should be reasonable to minimize any possible nuisance problems. Hours of operation should be reasonable. The court realizes that some neighbors would consider anything but a complete cessation of activity to be a nuisance. To give serious consideration to that view is as extreme as a fill operation without any regulation. Both do grave injustices to the rights of other parties. At this stage, it appears to the court that much, if not all, of these proceedings could have been avoided had the parties taken more reasonable attitudes and had been willing to negotiate with each other in good faith.

## V

### Conclusions

The court specifically finds that:

1. the ordinance of the defendant does not, by its terms, prevent the operation of the plaintiff's foundry sand deposit site;

2. the defendant's agents and officials, with regard to other activities of a similar nature to that proposed by the plaintiff, have acted in a manner which is inconsistent with the present position taken by the defendant;

3. on the basis of the express or tacit approval of other deposit areas, and the record made concerning the specifics of the plaintiff's operation, there is no good reason shown to now prevent the plaintiff from going forward to the completion of his licensed project;

4. while Act 87 would permit the defendant to enact local regulations, the defendant has not done so;

5. as a result of the non-action with respect to local regulation only the regulations of the Michigan DNR under authority of Act 87 operate to regulate the plaintiff;

6. under the facts of this case and the law of the state of Michigan the use of aesthetic considerations as a primary factor in making zoning decisions is improper;

7. the foundry sand dealt with by the plaintiff in this case is not toxic;

8. the plaintiff's property was suitable for uses consistent with its R–1A zoning before the start of plaintiff's licensed project and will continue to be suitable and compatible for such uses after the completion of plaintiff's licensed project.

In order to provide a ready forum for the expeditious resolution of any future disputes which may arise in connection with the activity of the plaintiff which is the subject matter of the instant litigation, this court will retain jurisdiction in this matter while continuing its stay against the defendant.

A judgment order will enter in conformance with this opinion.